Opinion by Judge WILKEN; Partial Concurrence and Partial Dissent by Judge BYBEE.
OPINION
WILKEN, District Judge:
Plaintiff-Appellant Devon Scott Shelley appeals the district court’s grant of summary judgment in favor of Defendant-Appellee Pete Geren, Secretary of the Army and the United States Army Corps of Engineers (collectively, the Corps). Shelley sued the Corps for violating the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., by failing to interview him and rejecting his applications for two promotions. We have jurisdiction pursuant to 28 U.S.C. § 1291 to consider Shelley’s appeal. We find that Shelley presented a prima facie case of age discrimination and evidence of pretext sufficient to create a material dispute as to whether age-related bias was the “but-for” cause of the Corps’ failure to interview and promote him. The district court’s grant of summary judgment in favor of the Corps is reversed.
BACKGROUND
In 2005, the Corps sought to fill a GS-14 Supervisory Procurement Analyst position in the Contracting Division at its Kansas City District. The position was also known as Chief of Contracting. The Corps pursued a two-step hiring process, in which it advertised an opening for a 120-day temporary position, and then announced a formal process to hire a permanent Chief of Contracting.
An email announcement of the 120-day position was made on October 3, 2005, and courtesy copies were sent to Major Kelly Butler and Regional Contracting Chief Joseph Scanlan. The announcement explained that recruitment for the permanent position would begin in the near future. Applicants were instructed to email or fax their current resume/application, copies of their two most recent performance appraisals, proof that they had completed the educational requirements, and proof of eligibility for a Critical Acquisition Position.
Shelley applied for the 120-day position. At the time, he had been serving as Assistant Chief of the Contracting Division for the Walla Walla District, a GS-13 position, for over a year. In that position, Shelley supervised, coordinated, and managed the work of Team Leaders. Shelley was supervised by Connie Oberle, the Chief of Contracting at Walla Walla. He held a master’s degree in business administration, had twenty-nine years of experience in contracting (twenty-six of which were with the Corps), and had received numerous awards for his work. In 2005, Shelley *602 had received a “Special Act Award” for “major acquisition accomplishments and acquisition research [and] policy.” In 2003, he had received a Bronze Star Medal for exceptionally meritorious acquisition service as a Contracting Officer with the Corps while deployed to the Afghanistan Area Office. He was born in 1951 and was fifty-four years old at the time of his application for the 120-day position.
Butler served as the selecting official for the 120-day position. She received about nine resumes and rated them according to the criteria from the position announcement, which she summarized as “[b]asieally their experience.” No other officials reviewed the resumes for the 120-day position. Butler also spoke with the applicants’ references.
Butler testified that Oberle gave a negative reference for Shelley. She stated, “I called Connie for a reference for [Shelley]. And, really, Connie’s reference is why we did not choose [Shelley].” Butler explained, “When I get a big No feeling from the supervisor, that sends a red flag.” Later, Butler changed her testimony, stating that Oberle’s reference was “one of the reasons we did not choose [Shelley].” Oberle, however, denied ever having spoken with Butler regarding Shelley’s qualifications. Oberle testified that she spoke with Scanlan and informed him that Shelley was interested in the 120-day position, and that the job would be a “wonderful opportunity for him.”
Butler consulted about the applicants with Colonel Michael Rossi, Commander of the Kansas City District, and Steve Iverson, Deputy District Engineer for Project Management for the same district. They agreed that Vince Marsh should be hired. Marsh was serving as a Supervisory Procurement Analyst and Chief of the Business Management Division in Huntsville, Alabama, a GS-14 position, and had been serving in the position for more than a year. He supervised approximately fifteen employees and served as Director of Contracting for the Business Management Division “as requested.” In his prior position, as Business Operations Manager at the United States Army Contracting Command in Europe, Marsh had also served as Director of Contracting “as requested,” supervising seventy-five contract specialists on those occasions. He was forty-two years old at that time, born in 1963. He had twenty years of experience in contracting (fourteen in contracting positions and six in procurement positions). He had been with the Corps for less than two years. The most recent award listed on Marsh’s resume was a “Sustained Superior Performance Award” he had received in 2002, before joining the Corps.
Butler interviewed Marsh for the position. There is no evidence that she interviewed other candidates.
On November 2, 2005, Kevin Brice, Business Management Division Chief, sent an email seeking approval to hire Marsh for the 120-day position. Brice stated that he and Rossi recommended Marsh for the position, that Scanlan had participated in the selection process, and that Butler believed Marsh was Seanlan’s top pick. Marsh’s selection was approved.
Scanlan knew Shelley and was aware that Shelley was in his fifties. Scanlan had served as a superior to Shelley, and had worked with him for about six years. He was familiar with Shelley’s credentials and experience working for the Corps. He knew that, as Assistant Chief of Contracting for the Walla Walla District, Shelley had, at various times, served as Acting Chief of Contracting when Oberle was absent. Scanlan expressed confidence in Shelley’s performance of his duties as Acting Chief of Contracting and testified that *603 both technically and professionally Shelley was a good contracting officer.
At the time Scanlan supported Marsh for the 120-day position, he knew Marsh only by reputation. They had met at a social event for the Army Contracting Command in Germany. Scanlan’s belief that Marsh was the best candidate for the 120-day position was not based on any personal experience working with him. Scanlan, however, told Butler, Brice, Iverson, Rossi and Kevin Bond, District Counsel Chief, who later joined the selection panel for the permanent position, that he had worked with Marsh in Germany, and that he believed Marsh would do very well in the 120-day position.
Shelley learned that he was not selected for the 120-day position on or about November 4, 2005.
Meanwhile, on October 24, 2005, the permanent position and job description had been announced, and the Corps began accepting applications. The selection plan called for a panel of five members to review applications. The panel members were Scanlan, Brice, Rossi, Bond, and Mary Parks, Chief Contracting Specialist. Scanlan, Brice and Rossi had all participated in the hiring decision for the 120-day position. Rossi was assigned to chair the panel.
The selection plan identified four criteria on which to screen applicants for interviews: technical competency, management skills, leadership and teamwork. On each criterion, the applicants were to be evaluated as “outstanding,” “fully successful,” or “minimally acceptable.” Possession of a graduate level degree was a factor in ranking a candidate as outstanding for technical competency. A factor to be considered with regard to management skills was supervision of over thirty employees.
Oberle testified that, around the time the hiring process was taking place, Scanlan and Brice requested from the contracting chiefs information about projected retirement dates for employees in their districts and divisions. Scanlan did not recall asking his chiefs for information on retirement eligibility. He admitted, though, that in 2004 or 2005 he had requested, from the districts, certain data which, at that time, was provided in a spreadsheet entitled Capable Workforce Matrix. Although the matrix did not include the names of the employees, it included information such as job titles, grade levels, number of employees in a particular position in a division, as well as their anticipated retirement dates. The example in the record of this matrix for the Walla Walla Contracting Division is dated March 21, 2006, but apparently the same format was used in 2004 and 2005. It is clear from the 2006 version of the matrix for the Walla Walla Contracting Division that it would be a simple matter to deduce the names of the incumbents from the position titles within the division.
Thirty-three individuals applied for the permanent position, including Shelley, Marsh, and Oberle. The panel members independently evaluated the applicants as outstanding, fully successful, or minimally acceptable, on each of the four selection criteria, based on their resumes. On December 19, 2005, the panel members convened by teleconference to select candidates for interviews. Scanlan testified that he did not share any age-related information about Shelley at the teleconference. Brice testified that age was not a consideration in evaluating the applicants, although information on the resumes could allow panelists to estimate applicants’ ages.
During the teleconference, each panelist placed the candidates in either the top *604 third, middle third, or bottom third of the applicant pool. The spreadsheet summarizing these scores does not identify the panelists by name, but it shows that two candidates received a top score from each of the five panelists. Marsh and another candidate received four top scores and a mid score. A fifth candidate received four top scores and a bottom score. An applicant named Robert received three top scores and two mid scores. These were the six candidates selected for interviews. Shelley was given a top score by three of the five panelists. He was initially given a mid score by two panelists. This ranking would have been equal to that which had earned Robert an interview. But one panelist — whose identity is not disclosed in the record — changed Shelley’s mid score to a bottom score. Shelley was not given an interview.
Marsh was, at forty-two years old, the youngest interviewee. The oldest interviewee was fifty-five years old, one year older than Shelley. The other interviewees were forty-six (two of them), fifty, and fifty-three years old.
On January 20, 2006, the panel recommended Marsh for the permanent position. On or about February 17, 2006, Shelley learned that he had not been afforded an opportunity to interview for the permanent position. On April 16, 2006, Marsh was reassigned to the permanent Chief of Contracting position.
On March 6, 2006, seventeen days after Shelley learned that he had been denied an interview for the permanent position, he made initial contact with the Corps’ Equal Employment Opportunity (EEO) officer. On May 12, 2006, after receiving notice of his right to file a formal complaint of discrimination, Shelley did so, alleging that he had been discriminated against between November 2005 and January 2006 due to his age, in that he was “not afforded the anticipated interview opportunity thereby eliminating his promotion opportunity for the Kansas City District GS-14, Chief, Contracting Division position.” After the EEO office denied his claim in its Final Agency Action on June 27, 2008, Shelley filed suit in federal district court on July 28, 2008.
The district court granted summary judgment in favor of the Corps. The court assumed, without deciding, that Shelley timely exhausted his administrative remedies as to both the 120-day position and the permanent position. The court declined to analyze the motion in accordance with McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), finding it inapplicable to ADEA cases after the Supreme Court’s decision in Gross v. FBL Financial Services, Inc., 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009). Relying on Gross, the district court held that Shelley put forth insufficient facts that his age was the “but-for” cause of his non-selection for the 120-day position and for an interview for and promotion to the permanent position.
Shelley appeals.
STANDARD OF REVIEW
We review de novo a district court’s grant of summary judgment. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact, and whether the district court applied the relevant substantive law. Id. “Whether a plaintiff has exhausted administrative remedies as required before filing suit is a question of law, which we review de novo.” Bankston v. White, 345 F.3d 768, 770 (9th Cir.2003).
*605 DISCUSSION
I. Administrative Remedies
Preliminarily, the Corps argues that we may not consider Shelley’s complaint of non-selection for the 120-day position because he failed to seek administrative remedies for that decision in a timely manner. The Corps argues that Shelley failed to contact the EEO office within forty-five days of learning that he was not selected for the 120-day position and failed to complain about his non-selection for the 120-day position in his formal complaint of discrimination in the EEO administrative process.
Federal employees who believe they have been discriminated against on the basis of age have “the option of pursuing administrative remedies, either through the agency’s EEO procedures, or through the Merit Systems Protection Board.” Bankston, 345 F.3d at 770 (internal citations omitted). Equal Employment Opportunity Commission (EEOC) regulations provide that an aggrieved federal employee who pursues the EEO avenue must consult an EEO counselor within forty-five days of the effective date of the contested personnel action, prior to filing a complaint alleging age discrimination. 29 C.F.R. §§ 1614.103, 1614.105(a)(1).[1] We have stated that
although the regulatory pre-filing exhaustion requirement at § 1614.105 “does not carry the full weight of statutory authority” and is not a jurisdictional prerequisite for suit in federal court, we have consistently held that, absent waiver, estoppel, or equitable tolling, “failure to comply with this regulation [is] ... fatal to a federal employee’s discrimination claim” in federal court.
Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch, 572 F.3d 1039, 1043 (9th Cir.2009) (alterations in the original) (quoting Lyons v. England, 307 F.3d 1092, 1105 (9th Cir.2002)).
Shelley took the position that he timely initiated the EEO process on March 6, 2006, after he learned on or about February 17, 2006, that he had been denied an opportunity to interview for the permanent Chief of Contracting position. In his EEO complaint, Shelley asserted that he was discriminated against, between November 2005 and January 2006, based on his age. Shelley asserted that because of his age he was not given an interview, thereby eliminating his promotion opportunity. Shelley learned that he was not selected for the 120-day position on or about November 4, 2005. Thus, the time period Shelley specified in his EEO complaint encompasses the hiring process for both the 120-day and the permanent Chief of Contracting positions. Reading the EEO complaint liberally, as we must, see Greenlaw v. Garrett, 59 F.3d 994, 999 (9th Cir.1995), it is apparent that Shelley complained about both hiring decisions.
Further, the decisions were not discrete employment actions, but were part of a single, two-step, hiring process. The Corps sought to fill the position first on a temporary basis, followed by a permanent appointment after 120 days. It is obvious that the person selected for the temporary position would have a significant competitive advantage over the other applicants *606 for the permanent position, and therefore that the temporary appointment could be seen as a step towards the permanent appointment. Also, the limited nature of the hiring process for the temporary position, and the fact that the recruitment for the permanent position started less than a month after the temporary position was announced, could have led an applicant to view the processes as a continuum.
The interrelatedness of the two positions and of the hiring processes for them persuades us that the process for filling the Chief of Contracting position was a single course of conduct that began in 2005 with the selection of Marsh for the 120-day position and ended on April 16, 2006, when Marsh was confirmed as the new Chief of Contracting. Because Shelley filed his EEO complaint on March 6, seventeen days after he learned that he had not been selected to interview for the permanent position, he met the 45-day requirement of 29 C.F.R. § 1614.105(a).
Even if we assume that the two promotions were discrete employment actions, Shelley’s complaint was still timely. “Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge.” Green v. Los Angeles County Superintendent of Schools, 883 F.2d 1472, 1476 (9th Cir.1989) (internal quotation marks omitted). In determining whether a new claim is like or reasonably related to allegations contained in the previous charge, the court inquires into “whether the original EEOC investigation would have encompassed the additional charges.” Id. The same is true of a complaint of discrimination submitted to a federal agency’s EEO office. See Greenlaw, 59 F.3d at 1000 (citing Sosa v. Hiraoka, 920 F.2d 1451, 1456-57 & n. 2 (9th Cir.1990)).
Here, the crux of Shelley’s complaint is that he was bypassed for promotion to the permanent Chief of Contracting position because of his age. Because of the close relationship between the two positions and the temporally-overlapping hiring processes for them, an EEO investigation into the hiring process for the permanent position would necessarily have led to the investigation of the hiring process for the temporary position. The case is therefore distinguishable from Williams v. Little Rock Municipal Water Works, 21 F.3d 218 (8th Cir.1994), upon which the Corps relies. There, the Eighth Circuit affirmed partial summary judgment in favor of the defendant on the plaintiffs racial discrimination claim, finding that the plaintiffs EEOC complaint for retaliation included no mention of racial discrimination, and her allegations of racial discrimination submitted to the EEOC years earlier were not deemed reasonably related to her current claim for retaliation. Id. at 222-23.
In sum, Shelley’s initial contact with the Corps’ EEO officer seventeen days after he learned that he had been denied the opportunity to interview for the permanent Chief of Contracting position timely initiated his administrative claim based on being denied interviews and selection for the 120-day and the permanent positions, all of which occurred as part of the same course of conduct by the Corps. Shelley timely exhausted available administrative remedies.
II. Summary Judgment Disposition of Age Discrimination Claim
Shelley’s failure-to-promote claim is a claim of disparate treatment under the ADEA. The ADEA makes it unlawful for an employer to discriminate “because of [an] individual’s age.” 29 U.S.C. § 623(a)(1). The prohibition is “limited to individuals who are at least 40 years of *607 age.” 29 U.S.C. § 631(a). The ADEA applies to protect federal employees and applicants for federal employment. 29 U.S.C. § 633a(a). To prevail on a claim for age discrimination under the ADEA, a plaintiff must prove at trial that age was the “but-for” cause of the employer’s adverse action. Gross, 129 S.Ct. at 2350. “Unlike Title VII, the ADEA’s text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor.” Id. at 2349.
This case, however, was resolved on summary judgment, and not on the merits. Prior to Gross, our circuit applied the burden-shifting evidentiary framework of McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817, to motions for summary judgment on ADEA claims. See, e.g., Coleman v. Quaker Oats Co., 232 F.3d 1271, 1281 (9th Cir.2000); Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994); Rose v. Wells Fargo & Co., 902 F.2d 1417, 1420 (9th Cir.1990); Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir.1983). The district court declined to apply this framework, believing that Gross rejected it. The Corps argues to the same effect.
We disagree. In Gross, the Court grappled with whether a mixed-motives instruction may be given to the jury in an ADEA case.[2] 129 S.Ct. at 2348. Relying on the text of 29 U.S.C. § 623(a)(1) and case law allocating the burden of persuasion, the Court held that a plaintiff retains at all times the burden of persuasion to establish that age was the “but-for” cause of an employer’s adverse action. Id. at 2352. Because Gross involved a case that had already progressed to trial, it did not address the evidentiary framework applicable to a motion for summary judgment. The Court, in fact, explicitly noted that it “has not definitively decided whether the evidentiary framework of McDonnell Douglas utilized in Title VII cases is appropriate in the ADEA context.” Id. at 2349 n. 2.
Since the decision in Gross, several sister circuits have continued to utilize the McDonnell Douglas framework to decide motions for summary judgment in ADEA cases. See, e.g., Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir.2009); Velez v. Thermo King de P.R., Inc., 585 F.3d 441, 446-47 (1st Cir.2009); Connolly v. Pepsi Bottling Grp., LLC, 347 Fed. Appx. 757, 759-61 (3d Cir.2009) (unpublished).[3] We join them and hold that nothing in Gross overruled .our cases utilizing this framework to decide summary judgment motions in ADEA cases. The McDonnell Douglas test is used on summary judgment, not at trial. Costa v. Desert Palace, Inc., 299 F.3d 838, 855 (9th Cir.2002) (“This legal proof structure is a tool to assist plaintiffs at the summary judgment stage so that they may reach trial ... [I]t is not normally appropriate to introduce the McDonnell Douglas burden-shifting framework to the jury.”). The McDonnell Douglas test shifts only the *608 burden of production, after the plaintiff makes a prima facie case. See, e.g., Tusing v. Des Moines Cmty. Sch. Dist., 639 F.3d 507, 515 n. 3 (8th Cir.2011) (“The McDonnell Douglas analysis is likely still an appropriate way to analyze ADEA ‘pretext’ claims, however, because McDonnell Douglas only shifts the burden of production.”); Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir.2009) (“Gross stands for the proposition that it is improper to shift the burden of persuasion to the defendant in an age discrimination case. McDonnell Douglas, however, imposes no shift in that particular burden.”). “If plaintiffs establish a prima facie case, ‘[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged actions.’ ” Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155 (9th Cir.2010) (quoting Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123-24 (9th Cir.2000)). “If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant’s proffered reasons for their terminations are mere pretext for unlawful discrimination.” Id. Because the continued use of McDonnell Douglas in summary judgment motions on ADEA claims is not inconsistent with Gross, we cannot overrule our prior precedent because of Gross.
Thus, to survive summary judgment on his claim for a violation of the ADEA under the disparate treatment theory of liability, Shelley must first establish a prima facie case of age discrimination. Coleman, 232 F.3d at 1280-81. If he is successful, the burden of production shifts to the Corps to articulate a legitimate nondiscriminatory reason for its adverse employment action. Id. at 1281. It is then Shelley’s task to demonstrate that there is a material genuine issue of fact as to whether the employer’s purported reason is pretext for age discrimination. Id. At trial, he must carry the burden to prove that age was the “but-for” cause of his non-selection.
A. Prima Facie Case
A “prima faeie case requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.” O’Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (internal quotation marks omitted) (alterations in original).
In a failure-to-promote case, a plaintiff may establish a prima facie case of discrimination in violation of the ADEA by producing evidence that he or she was (1) at least forty years old, (2) qualified for the position for which an application was submitted, (3) denied the position, and (4) the promotion was given to a substantially younger person. See Steckl, 703 F.2d at 393 (holding that the plaintiff established a prima facie case for age discrimination under the McDonnell Douglas framework because he “was clearly within the protected class, had applied for an available position for which he was qualified, and was denied a promotion which was given to a younger person”); see also O’Connor, 517 U.S. at 313, 116 S.Ct. 1307 (“Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.”); Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir.1996) (finding that the requirements for a prima facie case of age discrimination were satisfied by evidence that the fifty-four year old plaintiff was discharged, he was perform *609 ing his job satisfactorily, and his duties continued to be performed by a substantially younger employee, and holding that the district court “erred in concluding that to establish a prima facie case, [the plaintiff] was required to show that he was at least as qualified as his replacement”).[4]
It is undisputed that Shelley was fifty-four at the relevant time, he was qualified for both the temporary and the permanent positions, he was denied both positions, and both went to a substantially younger candidate. Accordingly, Shelley has established a prima facie case of age discrimination.
B. Facial Legitimacy of the Corps’ Explanation
The burden now shifts to the Corps to provide a non-discriminatory explanation for its hiring decisions. Coleman, 232 F.3d at 1281. The Corps did so here. In its brief on appeal, the Corps proffers as its non-discriminatory explanation that Marsh was already employed as a GS-14 Supervisory Procurement Analyst, and hiring him caused a lateral move, whereas the position would have been a promotion for Shelley, who was serving at the GS-13 level. This is a facially legitimate explanation.
C. Pretext
The Corps’ articulation of a legitimate non-discriminatory reason shifts the burden back to Shelley to raise a genuine factual question as to whether the proffered reason is pretextual. The plaintiff can prove pretext “(1) indirectly, by showing that the employer’s proffered explanation is ‘unworthy of credence’ because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer.” Chuang, 225 F.3d at 1124. All of the evidence — whether direct or indirect — is to be considered cumulatively. Id. We conclude that Shelley offered both direct and indirect evidence of pretext.
i. Direct Evidence
Shelley presented direct evidence of age discrimination to rebut the Corps’ purported non-discriminatory reason. Oberle testified that Scanlan and Brice inquired about the projected retirement dates for employees in the contracting divisions during the hiring period for the 120-day and permanent positions. A fact-finder could infer from this that they considered age and projected retirement relevant to the hiring decision. Despite the absence of names in the Capable Workforce Matrix, the format of the matrix permitted the identification of specific employees. The matrix contradicts Scanlan’s testimony that individual age information was not provided in that format.[5]
The Corps contends that the matrix, at best, establishes that Scanlan and Brice knew Shelley’s prospective retirement date, which, standing alone, would not sup *610 port an inference of age discrimination. But the fact that Scanlan and Brice sought out the retirement dates at the time of their participation in the hiring process for the temporary and permanent positions shows more than that the decision-makers may have known of the candidates’ ages. It raises an inference that they considered this information relevant to their decisions. Although Scanlan and Brice did not make the hiring decisions alone, evidence of their inquiry and of their influence over the process supports an inference that the Corps’ proffered explanation for hiring Marsh was a pretext for age discrimination. See Staub v. Proctor Hospital, — U.S. -, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011) (under Uniformed Services Employment and Reemployment Rights Act, discriminatory motive imputed to employer where a supervisor performs an act motivated by discriminatory animus that is intended by the supervisor to cause an adverse employment action, and that act is a proximate cause of the ultimate employment action).
ii. Indirect Evidence
Evidence of a plaintiffs superior qualifications, standing alone, may be sufficient to prove pretext. Raad v. Fairbanks North Star Borough School Dist., 323 F.3d 1185, 1194 (9th Cir.2003) (citing Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1492 (9th Cir.1995)). A comparison of Shelley’s and Marsh’s resumes gives rise to a factual dispute as to whether Shelley was better qualified for the position than Marsh. Compared to Marsh, Shelley had significantly more years of work experience related to contracting, and more experience employed in the Corps. As of October 2005, Shelley had twenty-nine years of experience in contracting, whereas Marsh had twenty years. Unlike Marsh, Shelley spent most of his career in the Corps. Shelley had been an employee of the Corps for over nineteen years, Marsh for five and a half years.
Furthermore, Shelley was already employed in a Contracting Division, while Marsh was a Supervisory Procurement Analyst in a Business Management Division. Shelley had been employed as Assistant Chief in the Contracting Division under Oberle in Walla Walla for over a year, and before that for four years as a Team Leader in Walla Walla under Oberle. Contrary to the Corps’ contention, Marsh served as Director of Contracting only “as requested.” Shelley, too, served as Acting Chief of Contracting in his supervisor’s absence. Although this fact was not included in his resume, Scanlan was aware of it, and testified that he had confidence in Shelley’s performance as Acting Chief of Contracting. Shelley’s resume identified more impressive and recent awards for on-the-job accomplishments than Marsh’s.
Shelley’s educational qualifications were superior to Marsh’s. Shelley held an M.B.A., while Marsh had no graduate level degree. The selection criteria for the permanent position indicate that possession of a graduate level degree is a factor in ranking a candidate as outstanding for technical competency.
The selection criteria for the permanent position listed supervision of at least thirty employees as a factor to be considered in evaluating management skills. The Corps incorrectly asserts that Shelley’s resume failed to indicate that he acted as a supervisor. While Shelley’s resume did not specify the number of employees he supervised, it did disclose that, as Assistant Chief of Contracting, he supervised, coordinated and managed the work of subordinate Team Leaders, who presumably led teams. Marsh relayed that he supervised fifteen employees in the position that he held at the time of his application. Al *611 though Marsh had supervised seventy-five employees on occasion when he served temporarily as Director of Contracting in Europe, it was not part of his regular job duties. Neither candidate clearly demonstrated that he met this criterion.
The Corps argues that, while Shelley’s qualifications as described after the fact were extensive, he did not include all of his work experience and skills in his resume. On appeal, however, Shelley relies exclusively on information that was listed in his resume to argue that his qualifications for the position were superior. Even absent the additional information (e.g., the value of construction contracts he successfully shepherded), Shelley’s resume demonstrated sufficient qualifications that a reasonable jury could find that he was substantially better qualified than Marsh. In addition, Scanlan testified that he had worked with Shelley for six years, and was familiar with Shelley’s experience and credentials.
Further, that Shelley was a GS-13 employee, while Marsh was a GS-14, was relevant only as to the 120-day position. Had Shelley been given that position, he would have become a GS-14 and his move to the permanent position would have been lateral, like Marsh’s.
None of the officials whose support for Marsh was cited in the email seeking approval for his hire for the 120-day position had reviewed the applicants’ resumes. Only Butler reviewed the resumes. Viewed in the light most favorable to Shelley, Butler’s testimony, read in conjunction with Oberle’s testimony, could be understood to indicate that Butler initially favored Shelley for the position, but that she used an alleged negative reference from Oberle (which Oberle denies she ever gave) as a pretext for hiring Marsh after learning that Scanlan favored Marsh for the position. Scanlan, it bears repeating, represented to Butler, Rossi, Brice, Iverson and Bond that he had worked with Marsh in Germany. He testified, however, that he recommended Marsh based only on his reputation. Scanlan had met him at a social event, but had never worked with him. As noted, Scanlan had sought out information about employees’ retirement eligibility at the time of the hiring process.
Accordingly, Shelley’s rejection for the 120-day position could be found to be based on age discrimination. If it was, then the inference that the decision-makers were biased would carry over to their decision-making for the permanent position. Further, the denial of the temporary position was clearly a causative factor in the denial of the interview and selection for the permanent position. If the first decision was caused by discrimination, a strong inference is raised that the subsequent decisions were as well.
The Corps argues that age bias cannot be inferred in the selection for the permanent position, because other applicants close in age to Shelley were interviewed for that position and Shelley was not. Those applicants, however, were not selected for the position, and instead Marsh, the significantly younger applicant, was hired. Stacking the interview pool with older candidates does not immunize the decision to hire a younger one. Of the five panelists who selected the interviewees, Scanlan, Brice, and Rossi had all participated in the hiring decision for the 120-day position. Shelley received a top score from three of the five panelists. It was only the alteration of one unidentified panelist’s score for Shelley from mid to bottom that cost Shelley an interview and disqualified him for the permanent position. The evidence of Scanlan’s discriminatory animus discussed above supports an inference that Scanlan was biased against Shelley and in favor of Marsh based on *612 age. The evidence of the workings of the hiring process supports an inference that Scanlan was able to influence the interview and selection decisions. Neither Shelley’s non-selection for an interview for the permanent position, nor the interviews of other older applicants who were not selected for promotion, disproves Shelley’s evidence supporting a prima facie case and pretext.
The evidence, viewed in the light most favorable to Shelley, is sufficient to allow a reasonable jury to find that the Corps’ reliance on Marsh’s GS-14 level, as compared to Shelley’s GS-13 level, was pretextual in the light of Shelley’s otherwise superior experience, education and recognition.
In sum, Shelley produced sufficient evidence to establish a prima facie case of age discrimination, and has responded to the Corps’ alleged non-discriminatory reason for refusing to promote him by identifying evidence, both direct and indirect, showing that the Corps’ explanation is pretextual.
CONCLUSION
Because Shelley initiated a timely administrative complaint and produced sufficient evidence in support of his ADEA claim, the district court’s grant of summary judgment in the Corps’ favor is reversed. The case is remanded to the district court for further proceedings in accordance with this opinion.
REVERSED and REMANDED.

. As an alternative to filing an administrative complaint, a federal employee may file a civil action in a United States district court under the ADEA after giving the EEOC not less than thirty days’ notice of intent to sue. 29 U.S.C. § 633a(d); 29 C.F.R. § 1614.201(a); see Bankston, 345 F.3d at 770. There is no evidence that Shelley provided the EEOC with notice of his intent to sue the Corps, and he does not appear to rely on this alternative avenue.

. Mixed-motives jury instructions are used in Title VII cases where an employee alleges that he or she suffered an adverse employment action because of both permissible and impermissible considerations, i.e., a “mixed-motives” case. Gross, 129 S.Ct. at 2347 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). Under such instructions, if a Title VII plaintiff shows that discrimination was a “motivating” or a “substantial” factor in the employer’s action, the burden of persuasion would shift to the employer to show that it would have taken the same action regardless of that impermissible consideration. Id.

. We have done the same in non-precedential, unpublished decisions. Russell v. Mountain Park Health Ctr. Props., LLC, 403 Fed.Appx. 195, 196 (9th Cir.2010); EEOC v. Banner Health, 402 Fed.Appx. 289, 290-92 (9th Cir.2010).

. It thus appears that, as part of the prima facie case, a plaintiff does not have to show that he was discriminated against in favor of a substantially younger employee with equal or inferior qualifications. If Shelley were required to show this, he has done so, as discussed below in connection with his showing of pretext. See Lowe v. City of Monrovia, 775 F.2d 998, 1005 (9th Cir.1985), as amended, 784 F.2d 1407 (9th Cir.1986) (holding that in order to show pretext, a plaintiff may rely on the same evidence that he offered to establish a prima facie case).

. Although the Walla Walla Capable Workforce Matrix in the record is dated March 21, 2006, after Shelley was denied an opportunity to interview, it displays the same information that Scanlan and Brice had requested earlier, and shows that one could deduce the names of individual employees.