# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| KIRSTEN WILEY, | No. 69694-7-I |
| Appellant, | DIVISION ONE |
| v. | |
| MICROSOFT CORPORATION, a Washington corporation, | UNPUBLISHED OPINION |
| Respondent. | FILED: March 10, 2014 |

SPEARMAN, A.C.J. — Former Microsoft Corporation employee Kirsten Wiley appeals the trial court's summary dismissal of her claims against the company for (1) gender discrimination in violation of the Washington Law Against Discrimination ("WLAD"), chapter 49.60 RCW, and (2) breach of an enforceable promise of specific treatment in specific circumstances under Thompson v. St. Regis Paper Co., 102 Wn.2d 219, 685 P.2d 1081 (1984). Finding no error, we affirm.

## FACTS[1]

Kirsten Wiley began working for Microsoft in 1992 in a sales position and was last promoted in 2007 to a director of marketing and communications position in the Microsoft Research ("MSR") Group. In that role, she was responsible for providing marketing and public relations services to business

---

[1] The trial court sealed certain records, which remain sealed in this court. Accordingly, we have granted Wiley's motion to file her unredacted briefs under seal.

partners within MSR and generating news coverage and publicity to support their goals. She also directed some of the work of Waggener Edstrom, Microsoft's primary external public relations agency. Wiley's reviews from 2006 to 2009 were generally positive. She earned accolades,[2] but also received constructive criticism during that time.[3] Since 2003, Wiley reported to Kevin Schofield, who reported to Rick Rashid, who reported to Chief Research and Strategy Officer Craig Mundie, who reported to Chief Executive Officer Steve Ballmer.

In 2009, Mundie instructed the MSR public relations team and the Corporate Communications team to coordinate more closely to ensure the cohesiveness of Microsoft's external communications. Several individuals in Corporate Communications had problems working with Wiley. These included David Pritchard (a senior director and Mundie's chief of staff), Peter Haynes (Pritchard's direct report), Frank Shaw (hired in August 2009 as the vice president of Corporate Communications), and Tom Pilla (a communications manager and Shaw's direct report). Pritchard, Haynes, and Shaw agreed to keep

---

[2] Wiley's reviews were as follows: 2006 – Achieved, Strong; 2007 – Exceeded, 20%; 2008 – Achieved, 20%; 2009 – Achieved, 20%. Twenty percent was the highest possible rating. Her reviews included praise ("You are a huge asset to the organization and a fantastic contributor." Clerk's Papers (CP) at 1010 (2007 review). "You've been doing really solid work this year." CP at 1017, (2008 review). "You're clearly delivering great results for MSR and for the company, in a tough and rapidly changing environment." CP at 1021, (2009 review)). Wiley was designated a "high potential" employee in 2008 and 2009 and was selected for Microsoft's "Bench" program in 2008. CP at 1044. In 2010, she was awarded the "Gold Star" and a bonus of $80,000 worth of stock.

[3] These included concerns that Wiley failed to respond to e-mails and requests; left items unfinished or unmentioned when she went on vacation or had an unplanned absence; was defensive and negative with respect to new approaches and ideas; and at times was "too focused on the existence of a problem and [had] a hard time getting beyond creating a solution." CP at 140.

each other posted regarding their concerns about Wiley as they arose. CP 1104, 1107-08.

One incident took place in March 2010, when Mike Houlihan from Waggener Edstrom emailed Microsoft employee Lou Gellos and Wiley about a KUOW reporter's request for an interview about a Microsoft technology and a patent issued that day.[4] CP at 1157. Wiley responded, "Microsoft doesn't comment on patents." Id. Gellos then sent Wiley's email to Shaw and others, writing that KUOW was interested in a recent patent filing and stating, "In the spirit of rapidly responding to a request that is newsworthy, I asked MSR for some help amplifying their fine innovative work. And I received what we regularly receive. A wall." Id. Shaw wrote to Wiley, "'Why would we not want to talk about this technology? Not the patent per se, but what it could mean?'" CP at 155. He had also not heard of a Microsoft policy of not commenting on patents.[5] CP 764. Wiley, Shaw, and Schofield exchanged emails, with Wiley and Schofield expressing concerns about not knowing what the reporter wanted to talk about and whether there was someone who could speak on such subject. Wiley stated that she wanted to decline on the story. Shaw wrote, "At this point, I think I am just going to give up. It feels like we wildly overcomplicated this." He wrote that Wiley or Schofield could have done "a short interview that would have reflected well on Microsoft and on MSR in our local community, with the chance to be

---

[4] The patent application had been published for nearly two years.

[5] Microsoft does not have a policy of not commenting on patents. Wiley contends it does, pointing to Mundie's testimony. But Mundie's testimony was that "when patents have been filed, and in prosecution, in order not to disrupt the legal process of prosecuting an application, we...don't talk about those applications in any detailed way." CP at 1040. He did not testify that Microsoft does not comment on patents, only patent applications in prosecution.

3

picked up more broadly." Id. Shaw and Haynes were evidently frustrated, with Haynes writing to Shaw that KUOW did not want to write about "$#@%ing patents" and Shaw replying, "I'm getting hot now." CP at 1159.

Also in March 2010, Haynes asked Wiley to keep him "in the loop" about a particular developing story, and not wait until afterward to inform him, noting the need for his team to be involved along the way. CP at 260. He referred to Mundie's directive to "accrue to higher-level message goals." He then wrote to Shaw and Pritchard to express his apparent displeasure with Wiley.

In spring 2010, Schofield told Wiley that people in Corporate Communications had complained of difficulty working with her. Schofield then emailed Shaw that Wiley took the feedback well and was committed to making the partnership with his team and Haynes' team work, and that he would oversee her while she worked to repair relationships. Shaw forwarded the emails to Pilla, asking him to "reinforce" his message. Pilla responded, "'Will do.'" Id. Pilla understood Shaw's message to refer to his advice that Schofield should take the lead from Wiley as the main partner between her team and the teams of Shaw and Haynes. CP at 1172. Shaw wrote to Pritchard that Schofield had had a conversation with Wiley and that "[t]hat's a step." CP at 1179.

In July 2010, Shaw wrote to Pilla that Schofield had not received sustained feedback critical of Wiley and that it was time to be "super direct" with Schofield and "put the hammer down." CP at 1190. At some point, Pritchard, Haynes, and Pilla encouraged certain individuals to provide feedback to

4

Schofield about Wiley.[6] In August 2010, Pritchard suggested that Schofield meet with Human Resources and managers in Corporate Communications to discuss concerns about Wiley. On October 15, Pritchard, Haynes, and Pilla met with Schofield. Pritchard emailed HR director Sheryl Peterson, stating there was consensus amongst those attending the meeting that Wiley should be in a different role.

Schofield and Peterson began soliciting feedback about Wiley from her direct reports, Waggener Edstrom employees, and others from MSR and Corporate Communications. Seventeen men and women were interviewed, Shaw not among them. On December 6, 2010, Schofield and Peterson met with Wiley to discuss the feedback, which contained negative comments.[7] Schofield said Wiley had to take immediate steps to correct the issues identified. Schofield and Wiley prepared an action plan to help Wiley mend relationships with business partners and direct reports. Microsoft offered Wiley an executive coach and mentor. She declined the offer of a mentor.

---

[6] Haynes emailed one person on October 14, 2010, encouraging her to provide feedback to Peterson and stating that her doing so would be helpful to him and Pritchard.

[7] Comments included that she was "bullying," "blocking" and "scapegoating," was "disrespectful of leaders…and other groups," was "defensive" when approached, was "confrontational and resistant when people reach out to her," had a "negative attitude," had "zero credibility with partner teams," had a "lack of engagement, availability and physical presence" and "[did]n't want to do work or be accountable." CP at 264-66. Others noted that they "pick[ed] up a lot of work because of" Wiley "when it [was not] their job to do so." CP at 265. Some found that Wiley was "[u]nwilling to delegate" and "micromanage[d]." Id. Interviewees commented that Wiley had a "lack of strategy, marketing skills, experience and thought leadership," did not "understand the basics of marketing and PR," and that her "plans d[id]n't have goal[s] [or] strategies." Id. Some who gave feedback commented that they had been afraid to come forward with their concerns about Wiley because they feared she might retaliate against them or felt that Schofield condoned her behavior.

After the meeting, Wiley wrote to Schofield and Peterson, "I believe these slides and the behind-the-scenes work that led to their creation were constructed with the sole intention of creating a case to justify terminating me from Microsoft." CP at 267. She attributed the feedback to her standing up to Shaw and refusing to discuss patent applications with the media in violation of company policy.

On February 16, 2011, Wiley filed a complaint alleging (1) gender discrimination under the WLAD and (2) a Thompson claim for breach of a promise of specific treatment in a specific situation. The gender discrimination claim was based on (a) the feedback and treatment she received in 2010 and (b) Microsoft's alleged failure to promote her to a higher level and/or increase her salary, as compared to similarly situated male employees. For the Thompson claim, Wiley alleged Microsoft specifically promised employees that if they refuse to violate corporate policy, it would not permit retaliation against them and that she relied on this promise to her detriment when she refused to violate corporate policy by speaking to the media about patent applications.

On November 7, 2011, Wiley went on medical leave due to depression and anxiety. Microsoft held her position open for seven months before it replaced her with K.K., as she had not provided a return-to-work date.[8] CP 598. Following discovery, Microsoft filed a motion to dismiss Wiley's claims on summary

---

[8] Wiley never returned to work, and for reasons that are not in the record, is no longer a Microsoft employee. Wiley filed a motion in this Court under RAP 9.11 to supplement the record with three pages of additional new evidence from February and March 2013 that relate to why she is no longer employed at Microsoft. Her motion is denied; this evidence was not before the trial court when it ruled on Microsoft's motion for summary judgment. See RAP 9.12 (review of summary judgment limited to evidence before trial court).

judgment. The trial court granted Microsoft's motion and entered a judgment for Microsoft's costs. Wiley appeals the dismissal of both of her claims.

## DISCUSSION

This court reviews summary judgment de novo. Hearst Communications, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment should be granted only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Sheehan v. Central Puget Sound Regional Transit Authority, 155 Wn.2d 790, 797, 123 P.3d 88 (2005); CR 56(c). The court must consider all facts and reasonable inferences in the light most favorable to the nonmoving party. Michael v. Mosquera-Lacy, 165 Wn.2d 595, 601, 200 P.3d 695 (2009). Summary judgment is appropriate if reasonable minds could reach but one conclusion. Vallandigham v. Clover Park Sch. Dist. No. 400, 154 Wn.2d 16, 26, 109 P.3d 805 (2005).

### Gender Discrimination Claims

To prove sex discrimination under the WLAD, an employee must show that her employer "treats some people less favorably than others because of" their gender. Shannon v. Pay 'N Save Corp., 104 Wn.2d 722, 726, 709 P.2d 799 (1985), abrogated on other grounds by Blair v. Washington State University, 108 Wn.2d 558, 740 P.2d 1379 (1987) (internal quotation marks and citation omitted). The plaintiff in a disparate treatment lawsuit must present evidence that the defendant's discriminatory motive was a substantial factor in its adverse employment action. Mackay v. Acorn Custom Cabinetry, Inc., 127 Wn.2d 302,

7

310, 898 P.2d 284 (1995). An employee need not prove, however, that her protected status was the determining factor in the employer's decision. Id.

When evaluating a summary judgment motion in an employment discrimination case Washington courts use the burden-shifting analysis announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Fulton v. Dep't of Social & Health Servs., 169 Wn. App. 137, 148, 279 P.3d 500 (2012). A plaintiff has the initial burden to prove a prima facie case of discrimination. Id. To do so, the plaintiff must present evidence from which a jury may infer that an adverse employment decision was based on a discriminatory criterion. Shelley v. Geren, 666 F.3d 599, 608 (9th Cir. 2012) (citation omitted).[9] The burden then shifts to the employer to rebut any inference of discrimination by presenting evidence that the adverse action occurred for a legitimate, nondiscriminatory reason. Fulton, 169 Wn. App. at 149. If an employer does so, the presumption created by the plaintiff's prima facie case is rebutted and the burden shifts to the employee to identify evidence that the employer's stated reason is actually pretext for a discriminatory motive. Id. The case should be submitted to a jury only when all three facets of the burden-shifting scheme are met and the parties have produced sufficient evidence supporting reasonable but competing inferences of both discrimination and nondiscrimination. Id.

Feedback Process

Adverse employment action — At the outset, Wiley's claim fails because she does not show that the feedback process constituted an adverse

---

[9] Because WLAD "substantially parallel[s] Title VII," Washington courts "may look to federal law for guidance." Washington v. Boeing Co., 105 Wn. App. 1, 8, 19 P.3d 1041 (2000).

employment action. An adverse action is any tangible change in employment status or terms and conditions of employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Wiley does not show that the feedback process changed the terms or conditions of her employment. As Microsoft points out, its response to the feedback was to assist Wiley in preparing an action plan to address the criticism and offer to provide her an executive mentor and coach. There is no evidence Microsoft suspended, demoted, disciplined, or terminated her due to the feedback. She remained in her position for months after receiving the feedback and then commenced medical leave. Even though Wiley believed the feedback process was a setup to justify her termination, an employee's fear of losing his or her job in the future is not a materially adverse change in employment. McKenzie v. Ill. Dep't of Transp., 31 Fed. Appx. 922, 926 (7th Cir. 2002); see also Dage v. Johnson, 537 F.Supp.2d 43, 61-62 (D.D.C. 2008) (subjective fear of future employment action does not create triable issue of fact).

Wiley contends it is "undisputed that she had no job at Microsoft, and had been replaced in her position with a male." Reply Brief at 5-6. She contends the evidence supports a jury finding that the actions of Shaw, Haynes, Pritchard, and Pilla succeeded in setting her up for failure, influencing the decisions to remove her from her position, and predetermining her termination. She contends that although she stayed with the company after filing suit, she was excluded from emails and meetings and was shunned. But Wiley has neither alleged nor argued

based on these claims that she was constructively discharged from Microsoft. When the trial court ruled on the motion for summary judgment, Wiley remained employed by Microsoft as its director of marketing and communications.

Discriminatory animus – Wiley's discrimination claim also fails because she does not prove a prima facie case of discrimination. As she describes it, the crux of her claim is that "Microsoft allowed a group of male managers [Shaw, Haynes, Pritchard, and Pilla] to proximately cause the destruction of her career; and that they were motivated, at least in part, by gender bias. . . ." Reply Brief at 1. But while the evidence shows these men had problems working with her, reported their issues to Schofield, and made efforts to move her out of her role, it fails to permit a reasonable trier of fact to find that they harbored gender bias against her.

First, as to Haynes and Pritchard, Wiley points to no evidence specific to them that they were motivated by gender animus. As to Shaw, Wiley asserts that he was frustrated with her because she, a woman, stood up to him. She points out that he was in the Marines for eleven to twelve years, during which time he never had a woman who reported to him refuse a direct order. Such evidence does not permit the inference that Shaw had gender bias. He testified that everyone in the Marines was expected to follow a superior's orders, regardless of gender, and that he never had anyone, male or female, refuse a direct order. As to Pilla, Wiley points to an instant message he exchanged with another Microsoft employee in which he made sexual comments about one woman and referred to

two other women as "chicks."[10] But "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." (Citations omitted), Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545, (3d Cir. 1992). The instant message took place over a year after the events giving rise to this lawsuit and does not mention Wiley. Moreover, while Pilla encouraged a coworker to go to Schofield with feedback about Wiley, there is no evidence he was a decision maker in the feedback process or that any discriminatory animus he had was a "substantial factor" in any adverse employment action against Wiley.[11]

Wiley points to evidence that unidentified individuals in Corporate Communications referred to her as "Mrs. No" and a "[b]itch."[12] But there is no evidence Shaw, Haynes, Pritchard, or Pilla did so. Nor is there evidence about the persons who did—for instance, their gender or whether they played a role in

---

[10] In the instant message between Pilla and his coworker on January 5, 2012, Pilla asked if the latter spoke "'to the PR Week chick'"; the coworker later wrote that a certain female "is a complete bitch" and Pilla responded "what happened. did she not blow you? I told her to blow you. im so sorry"; and Pilla later referred to another female as a "chick." CP at 1279-82. This exchange took place on office computers.

[11] Wiley argues that Pilla's discriminatory mindset can be attributed to Microsoft, relying on Staub v. Proctor Hospital, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). Wiley cites that case for the proposition that discriminatory animus need not come from the employee's supervisor, and that it is sufficient here that Pilla was a supervisor of some kind. Staub stands for the proposition that if a supervisor performs an act motivated by discriminatory animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable even if the supervisor did not make the ultimate employment decision. Id. at 1194. In Staub, the employee did attribute discriminatory animus to his direct supervisor, unlike Wiley.

[12] In Wiley's declaration, she stated that Pilla told her that people in Corporate Communications referred to her as "Mrs. No" or a "[b]itch." CP at 1330. Schofield testified that Pilla told him people in Corporate Communications referred to Wiley as "Mrs. No" because she was resistant to working with new ideas and new opportunities. CP at 1048.

the feedback process. Wiley also points to Shaw's testimony that he had heard Corporate Communications referred to as an "old boys' club."[13] This is not evidence that Shaw, Haynes, Pritchard, or Pilla were motivated by gender animus. Shaw testified that he had heard that term because "there was a set of people who had been there a long time." CP at 1074. As Microsoft posits, the reference as Shaw understood it was one regarding tenure. This is supported by evidence that the group was headed by a woman—Shaw's supervisor—at the time Shaw was hired. There is no evidence of the gender makeup of Corporate Communications, nor is there evidence that Shaw, Haynes, Pritchard and Pilla were motivated to maintain any gender dynamic. Furthermore, Wiley was not in Corporate Communications.

Legitimate and non-discriminatory reason – Next, even if Wiley met her burden of proving a prima facie case of discrimination, Microsoft asserts a legitimate and non-discriminatory reason for addressing Wiley's performance in 2010. Based on feedback from her coworkers, Microsoft had legitimate reasons to believe that she had performance issues that warranted addressing.

Pretext – Wiley does not show pretext. To show pretext, a plaintiff must produce evidence that the defendant's reason is "unworthy of belief." Hines v. Todd Pac. Shipyards Corp., 127 Wn. App. 356, 372, 112 P.3d 522 (2005). The "focus of a pretext inquiry is whether the employer's stated reason was honest,

---

[13] During his deposition, Shaw was asked, "Did it ever come to your attention that any woman in your group regarded your group as an old boy's network or old boy[s'] club?" Shaw responded, "When I joined the team, there was a set of people who had been there a long time, so it was before I joined the company, and I had heard that term." CP at 1074.

not whether it was accurate, wise, or well-considered." <u>Stewart v. Henderson</u>, 207 F.3d 374, 378 (7th Cir. 2000).

Wiley contends pretext is shown because there is evidence that (1) she received high reviews and accolades for 19 years before the events in question; (2) the feedback is untrustworthy; and (3) she was replaced by K.K., a male she alleges is from Corporate Communications and less qualified than her, even though a female was her recognized successor. We conclude that this evidence fails to create a genuine issue of material fact that Microsoft's reason for addressing Wiley's performance was unworthy of belief. To support her first point, Wiley cites <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129 (2nd Cir. 2000) for the proposition that a sudden drop in performance ratings, spike in performance criticism, or an employer's failure to properly document alleged deficiencies before making the alleged performance-based decision, is circumstantial evidence from which a jury may find pretext. But here, Microsoft documented concerns about Wiley as far back as 2005, and such concerns were consistent with the comments received in 2010.

Next, in contending the feedback is untrustworthy, Wiley asserts that "in many instances" it was not the individual's own observations but instead reported what other people said, pointing to (1) Schofield's testimony that one person told him another named employee sought guidance from Wiley and did not receive it and (2) Peterson's testimony that another person reported that an unidentified person described Wiley as "bullying" and "threatening." CP at 1202. These examples do not show that the feedback from seventeen people was unreliable. Wiley also asserts that those who gave feedback collaborated, noting that two

13

people said she spent too much time "in the weeds." CP at 1204, 1206. But even if the mere use of this term by two people showed any collaboration, it does not, without more, undermine the reliability of the report. She also contends the feedback from Heather Mitchell and Ann Paradiso is unreliable because Paradiso had little interaction with Wiley and Mitchell (one of Wiley's direct reports) was inconsistent. Wiley points out that a couple of months before Mitchell was interviewed, she had written to a colleague that she was "totally in her [Wiley's] camp defending her [Wiley] again." CP at 1229. But these circumstances do not show their feedback is unreliable, and moreover they were only two of seventeen individuals who gave feedback.

Finally, Wiley contends it is evidence of pretext that she was replaced by K.K., a male she alleges is from Corporate Communications[14] and less qualified than her, even though a female, K.B., was her recognized successor. This argument fails because, as noted, Wiley remained employed when K.K. was hired to fill her role.[15] Moreover, even assuming K.K. was less qualified than Wiley, it does not necessarily follow that he was unqualified for the position or was hired simply because he was a male. As for K.B., Wiley does not show that she sought the position or, that if she did, K.K. was less qualified than her. In any event, K.K.'s being hired does not show that Microsoft's reason for its actions

---

[14] Schofield's declaration states that K.K. did not work in Corporate Communications with Shaw. The only evidence to which Wiley points to dispute this, does not show that K.K. was in Corporate Communications.

[15] To the extent Wiley argues it is evidence of disparate treatment that she was replaced by a male, she must, to establish a prima facie case, "show that she: (1) is a member of a protected class; (2) was discharged; (3) was doing satisfactory work; and (4) was replaced by a person of the opposite sex or otherwise outside the protected group." Domingo v. Boeing Employees' Credit Union, 124 Wn. App. 71, 80, 98 P.3d 1222 (2004).

14

when it came to Wiley—the negative feedback from a number of individuals—is unworthy of belief.

### Promotion and Pay

Wiley claims gender disparity in her advancement and pay as compared to that of similarly situated males. She claims she should have been promoted from a Level 66 (which she attained in 2007) to a Level 67 or higher at some unspecified time and obtained greater compensation accordingly.

To establish a prima facie case of disparate treatment, a plaintiff must show (1) she belongs to a protected class, (2) she was treated less favorably in the terms or conditions of employment than a similarly situated, nonprotected employee, and (3) she and the comparator did substantially the same work. Domingo, 124 Wn. App. at 81. The plaintiff and the comparators must be similarly situated in all material respects. Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006). They should have the same supervisor and be subject to the same standards. Kirby v. City of Tacoma, 124 Wn. App. 454, 475 n.16, 98 P.3d 827 (2004).

Wiley's claims fail because she cannot show she and the comparators were similarly situated in all material respects. Wiley points to four comparators: B.C., S.C, D.G., and J.O.[16] These males and Wiley were not in similar positions with similar responsibilities and were not doing substantially the same work. None of the comparators were marketing professionals like Wiley. B.C. was a director of intellectual property strategy; S.C. a senior director of product

---

[16] Below, Wiley pointed to P.F. and T.H. in addition to these four. On appeal, she makes no mention of P.F. or T.H.

planning; D.G. a general manager of technology policy; and J.O. a director of program management.[17] Wiley and the comparators were also not evaluated by the same managers using the same standards. B.C. and J.O. reported to Schofield, but they were at a different level than Wiley, had B.S. degrees (required for their roles, unlike for Wiley's), and had technical positions focusing on technology itself rather than marketing. S.C. and D.G. did not report to Schofield, and both had Ph.D. degrees (computer science and theoretical chemistry and physics, respectively), compared to Wiley's B.A. degree.

Wiley points to the comparators' review scores, how long they were at Microsoft, their levels, and their salaries, and then contends that based on her review scores and length of employment she should have been promoted and received a higher salary. But these considerations do not go to whether the comparators were similarly situated to her in all material respects, did substantially the same work, or were subject to the same standards. Wiley also offers testimony that she interfaced regularly with the comparators, that all of them had to engage in collaboration, and that all of their jobs involved "research projects that were highly technical, and required a deep understanding of the technology[.]" CP at 1331. Wiley cites no authority to show that employees are similarly situated for such reasons. Finally, she contends she should have been promoted to Level 67 or higher because she was identified as "high potential" in

---

[17] Wiley's primary duties involved PR and media relations, while B.C.'s involved technology transfer from research to end product; S.C.'s involved planning for Windows Mobile and identifying gaps in intellectual property and product portfolio; D.G.'s involved appraisal of technology and technical liaising to the external community; and J.O.'s involved managing a team that facilitates technology transfer from research to product.

2008-2009. She contends this meant Microsoft expected she would receive two promotions within three to five years and notes she was at Level 66 for three years. But she offers no evidence of similarly situated males who were identified as "high potential" and were promoted in comparable periods.[18]

Thompson Claim

"Employer obligations may...arise independent of traditional contract analysis when the employer creates an atmosphere of job security and fair treatment with promises of specific treatment in specific situations and the employee relies thereon." Gaglidari v. Denny's Restaurants, Inc., 117 Wn.2d 426, 433, 815 P.2d 1362 (1991) (citing Thompson, 102 Wn.2d at 230). "'[A]n employee seeking to enforce promises that an employer made in an employee handbook must prove: (1) whether any statements therein amounted to promises of specific treatment in specific situations; (2) if so, whether the employee justifiably relied on any of these promises; and, finally, (3) whether any promises of specific treatment were breached.'" Bulman v. Safeway, Inc., 144 Wn.2d 335, 340-41, 27 P.3d 1172 (2001) (citing Thompson, 102 Wn.2d at 233). These elements present issues of fact, but may be decided as matters of law if reasonable minds could not differ. Korslund v. Dyncorp Tri-Cities Services, Inc., 156 Wn.2d 168, 185, 125 P.3d 119 (2005).

Wiley alleges Microsoft specifically promised employees that if they refuse to violate corporate policy, it would not permit retaliation against them, and that

---

[18] Moreover, the document on which Wiley relies states that "being identified as a HiPo is not to be used as ... [a]n automatic gateway or implied guarantee to a future promotion"). CP 1024; see also CP 379-82 ("There are no guarantees ... that you would remain a high potential person year over year, no guarantees that you would be promoted to the next band.").

she relied on this promise to her detriment when she refused to violate corporate policy by speaking to the media about patent applications. As evidence that Microsoft made this promise, Wiley points to:

(1) The *Whistleblowing Reporting Procedure and Guidelines* (in the electronic employee handbook ("Handbook") available through the "HRWeb" within the Microsoft intranet system, CP at 793-94), which states:

> Microsoft needs your assistance to ensure that it fully complies with all laws, company guidelines, and standards of ethical conduct....Microsoft will not tolerate retaliation against any employee for making a good-faith report, cooperating with an investigation under this procedure or applicable law, or refusing to participate in activities that violate applicable laws, company guidelines, or standards of ethical conduct. Any employee who engages in retaliation shall be subject to disciplinary action up to and including termination.

CP at 776.

(2) The *Microsoft Standards of Business Conduct* policy (not part of the Handbook, but accessible through a separate website—the "LCA [Legal and Corporate Affairs] Web." CP at 1329), which states:

> All Microsoft employees are responsible for understanding and complying with the Standards of Business Conduct, applicable government regulations, and Microsoft policies.
> …
> Openness, Honesty, and Respect: In our relationships with each other, we strive to be open, honest, and respectful in sharing our ideas and thoughts, and in receiving input.
> …
> The Standards of Business Conduct and the Business Conduct and Compliance Program are endorsed by and have the full support of the Microsoft Board of Directors. The Board of Directors and management are responsible for overseeing compliance with and enforcing the Standards of Business Conduct.
> …
> Microsoft will not tolerate any retribution or retaliation taken against any employee who has, in good faith, sought out advice or has reported a possible violation.

CP at 1340-44.

18

(3) The *Open Door* policy (also part of the Handbook).

> You are encouraged to air creative ideas, issues, or concerns....It is your responsibility to ask about things you do not know or understand, as well as to make suggestions that could improve any part of the company or its operations.

CP at 1338.

We conclude the trial court properly dismissed this claim. Initially, the "Open Door" policy contains no non-retaliation language. And both the whistleblowing guidelines and the Standards of Business Conduct contain express disclaimers.[19] Generally, employers are not bound by statements in employment manuals if they "state in a conspicuous manner that nothing contained therein is intended to be part of the employment relationship and are simply general statements of company policy." Thompson, 102 Wn.2d at 230.

---

[19] First, the Handbook contains disclaimers. When an employee clicks "Read the Employee Handbook," the following statement appears:

Disclaimer

HRWeb contains only general information and guidelines. It does not create any contractual rights or impose legal obligations on Microsoft or its subsidiaries, nor does it guarantee specific treatment in any given situation. HRWeb is updated frequently and is subject to change without prior notice. HRWeb is intended primarily as a general information resource for employees of Microsoft. Information and guidelines may vary by country and by subsidiary. Accordingly, employees of Microsoft subsidiaries should check with their HR representative for clarification.

CP at 752. To access the Handbook, the employee must sign into it. An employee signing into the Handbook views and agrees to the following statement, which provides in relevant part:

At-Will Employment Not Modified:

This handbook...contain[s] general guidelines only. [It is] not intended and shall not be read to create any express or implied promise or contract for employment, for any benefit, or for specific treatment in specific situations. Do not rely on any contrary oral or written statements, practices or conduct of Microsoft or its employees. Your employment relationship with Microsoft is at-will.

CP at 752-53. Wiley admits she was familiar with the Handbook's disclaimers, which she acknowledged dozens of times in the last eleven years of her employment.

The Standards of Business Conduct also contains a disclaimer. It states:

The Standards are not intended to and do not create an employment contract, and do not create any contractual rights between Microsoft and its employees or create any express or implied promise for specific treatment in specific situations.

CP at 1342.

19

See also Quedado v. Boeing Co., 168 Wn. App. 363, 374, 276 P.3d 365, rev. denied, 175 Wn.2d 1011, 287 P.3d 594 (2012) ("[A]n employer can disclaim what might otherwise appear to be enforceable promises in handbooks or manuals or similar documents.") (citing Swanson v. Liquid Air Corp., 118 Wn.2d 512, 526, 826 P.2d 664 (1992)).

"A disclaimer may be negated by later, inconsistent representations by the employer." Quedado, 168 Wn. App. at 374. Wiley contends the disclaimers here were negated by Microsoft's inconsistent representations and practices. She points to the annual trainings she received on the Standards of Business Conduct, during which, she states in her declaration, she was "again and again told to 'speak up' and raise concerns about laws, regulations, company policies and/or ethics, and specifically promised [she] would not be retaliated against for doing so." CP 1329. But her statement shows only that the Standards of Business Conduct were reiterated to her at trainings. She presents no evidence she was told, at trainings or otherwise, to disregard the disclaimer and that Microsoft intended to make promises of specific treatment in specific situations with regard to the non-retaliation statements.

Furthermore, we agree with Microsoft that Wiley's claim fails because she identifies no Microsoft policy prohibiting comment on patents.[20] Thus, she cannot show she was acting as a whistleblower, to invoke the non-retaliation policy and demonstrate a breach by Microsoft. Wiley contends that regardless of the existence of such a policy, she had a good-faith belief that what Shaw wanted

---

[20] As previously noted, Mundie did not testify that Microsoft does not comment on patents, only patent applications in prosecution.

her to do would violate company policy. But the non-retaliation language in the whistleblowing policy and Standards of Business Conduct pertains to good-faith seeking of advice or reports of violations. Wiley did neither; she simply told Shaw she wanted to decline on the KUOW story. Even if there was a policy prohibiting discussion of patents, Shaw did not ask Wiley to violate it; he told her a conversation could be conducted about the technology in question without talking about patents.

Wiley's gender discrimination and <u>Thompson</u> claims were properly dismissed on summary judgment.

Affirmed.

Spearman, A.C.J.

WE CONCUR: