Filed 10/23/23  Myers v. Cesar Chavez Foundation CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| JERRY MYERS,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>CESAR CHAVEZ FOUNDATION,<br><br>　　Defendant and Respondent. | F084545<br><br>(Super. Ct. No. BCV-19-100452)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Bernard C. Barmann, Jr., Judge.

Sagaser, Watkins & Wieland, Howard A. Sagaser and Lisa M. Horton for Plaintiff and Appellant.

Jackson Lewis, Nicky Jatana, Paul J. Cohen and Dylan B. Carp for Defendant and Respondent.

-ooOoo-

## INTRODUCTION

This appeal concerns two separate orders of the trial court, one a summary adjudication disposing of a number of discrimination claims and derivative causes of action based thereon, and the other imposing sanctions on appellant Jerry Myers after he moved for sanctions and disqualification of counsel for a third party witness for purported discovery violations. We find no error and affirm.

## BACKGROUND

Appellant, a White male aged 49 years old at the time relevant to this lawsuit, is a former maintenance employee of respondent Cesar Chavez Foundation. Appellant is dyslexic and disabled due to a prior work injury to his right wrist, arm, and shoulder; only the former of these claimed disabilities is at all relevant to this appeal. Appellant worked for respondent from February 20, 2013, to January 15, 2019, as an at-will employee.

The parties do not substantively dispute much of what led to appellant's termination, although they dispute whether the facts show a discriminatory motive. On January 2, 2019, an African-American employee of respondent, Jane Doe,[1] called the Director of Human Resources, Richard Torres, and complained about a number of different issues of workplace harassment she was experiencing. Torres met with Doe in person the next day. Torres then asked Doe to provide a written statement of her complaints, which she did. While the written complaint contained numerous allegations of behavior undesirable in the workplace, including other workers bullying, belittling, and shunning Doe, the majority of the allegations were not related to race or any other protected characteristic. However, Doe did complain that various unidentified staff

---

[1]    The parties refer to the complainant as "Jane Doe," even though the bulk of the record in this case was not filed under seal. While the complainant is named in these records, since she is not a party to this case and her identity is not of significant relevance here, we too will refer to her as "Jane Doe" or "Doe."

members had referred to her by racial slurs. Few details were provided about most of these purported racial comments.

However, one complaint from Doe included salient details sufficient to identify a particular instance of inappropriate conduct. Doe stated she had been informed by a staff member that another staff member, Adam P., had overheard appellant referring to Doe as a "Purple Gorilla" at a Christmas gathering with coworkers on December 7, 2018. Respondent has a written policy prohibiting "[v]erbal conduct such as making or using derogatory comments, epithets, slurs, or jokes," and the policy manual states an employee may be fired for this behavior.[2] Additionally, respondent has a zero tolerance policy regarding racist remarks. Torres therefore sought to investigate this comment, and interviewed both appellant and Adam P. Torres testified that, when he met with appellant, appellant was "very agitated, upset." According to Torres, appellant began to swear profusely and would not calm down, such that Torres eventually had to end the conversation because Torres could "just not quite reach [appellant]—and calm him down."

Torres also interviewed Adam P., who affirmed he had personally heard appellant refer to Doe as a "purple headed gorilla," or other similar comments, on numerous occasions. Torres asked both Adam P. and appellant to submit written statements. Torres concluded, based on his interviews, that Adam P. was telling the truth, and therefore terminated appellant for making racist remarks regarding a coworker in violation of respondent's policies. Appellant's primary factual dispute is about whether he ever made such statements, and he asserts repeatedly that he did not.

---

[2] While appellant purportedly disputed these facts in the trial court, and at various points insists they are disputed facts here, a review of appellant's disputes with these facts in the record shows that, while appellant has a different view of what the evidence means, he does not dispute that this policy exists.

Appellant filed his complaint in this case on February 19, 2019, alleging causes of action for age, race, and disability discrimination, along with derivative claims for wrongful termination in violation of public policy and unfair business practices in violation of Business and Professions Code section 17200. On April 22, 2020, respondent moved for summary adjudication on several different issues, namely that appellant's discrimination claims failed as a matter of law, that the derivative claims based thereon therefore also failed as a matter of law, and that appellant's request for punitive damages should be dismissed. On November 2, 2020, the trial court issued a written ruling granting respondent's motion for summary adjudication; the order granting dismissal was entered on December 2, 2020. The parties then settled the few remaining claims in order to permit this appeal to proceed.

Additionally, appellant appeals the award of sanctions against himself and his counsel. Appellant moved to disqualify counsel for certain third party witnesses on September 23, 2020, and sought sanctions for purported discovery abuses as part of that motion. The trial court denied this motion on November 9, 2020, and imposed monetary sanctions in the amount of $2,500 against appellant and his counsel.

## ANALYSIS

### I.      The Appeal is Timely

Before moving to the merits of this appeal, we must first address a procedural issue. Respondent argues this appeal is untimely. Specifically, respondent argues the appeal of the disqualification order is untimely because it was an appealable collateral order and needed to be appealed after it was entered and not after final judgment. Additionally, respondent asserts the appeal of the summary adjudication order was untimely because it violated the provisions of the parties' settlement agreement on the remaining claims, which specifically gave "60 days after entry of judgment" to appeal. Respondent is incorrect on both counts.

4.

Concerning the disqualification order, the "one final judgment" rule generally prohibits piecemeal appeals of orders throughout a case, prior to final judgment. (*See* Code Civ. Proc., § 904.1, subd. (a)(1); accord, *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697 [noting the rule is a "fundamental principle of appellate practice that prohibits review of intermediate rulings by appeal until final resolution of the case"].) There are, however, a number of exceptions to this rule, including the so-called "collateral order doctrine," which allows immediate appeals in certain cases prior to final resolution of the suit. (*Hanna v. Mercedes-Benz USA, LLC* (2019) 36 Cal.App.5th 493, 506.) "'When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act, direct appeal may be taken.'" (*Ibid.*) This rule is codified by statute, which provides an appeal may be taken from either an interlocutory judgment or an order "directing payment of monetary sanctions by a party or an attorney for a party if the amount exceeds five thousand dollars ($5,000)." (Code Civ. Proc., § 904.1, subd. (a)(11), (12).) "Sanction orders or judgments of five thousand dollars ($5,000) or less against a party or an attorney for a party may be reviewed on an appeal by that party after entry of final judgment in the main action ...." (*Id.*, subd. (b).) Here, appellant and his counsel were sanctioned $2,500 after appellant's motion to disqualify third party counsel for respondent's employees was denied. Since the order directed the payment of less than $5,000 in monetary sanctions, the statute requires appellant to wait until after final judgment in the main action to appeal the sanction. The appeal of the sanctions order is timely.

Meanwhile, concerning the shortened timeline for appeal contained in the settlement agreement related to the remaining claims, it is clearly established parties may not alter the time to appeal by agreement. As has been explained by our Supreme Court, the taking of an appeal is an act that vests this court with jurisdiction to hear the case. "'In the absence of statutory authorization, *neither the trial nor appellate courts may*

5.

*extend or shorten the time for appeal* [citation], even to relieve against mistake, inadvertence, accident, or misfortune [citations]. Nor can jurisdiction be conferred upon the appellate court by the consent or stipulation of the parties, estoppel, or waiver.'" (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 666–667, italics added, quoting *Estate of Hanley* (1943) 23 Cal.2d 120, 123; see *In re A.R.* (2021) 11 Cal.5th 234, 255, fn. 5; *Pressler v. Donald L. Bren Co.* (1982) 32 Cal.3d 831, 835; *Ventura Coastal, LLC v. Occupational Safety & Health Appeals Bd.* (2020) 58 Cal.App.5th 1, 35.) The time to appeal is set by rule 8.104 of the California Rules of Court, and is the earliest of any of the following:  (1) 60 days after the superior court clerk serves appellant a filed-endorsed copy of the judgment or a notice of entry of judgment; (2) 60 days after the appellant is served with those documents by a party; or (3) 180 days after entry of judgment.  (*Id.*, subd. (a)(1)(A)–(C).)  Respondent agrees the filing was timely under these rules, but argues the settlement agreement executed between the parties prescribed a different deadline, which was 60 days after entry of judgment, regardless of whether a notice of entry or a filed-endorsed copy of the judgment was served.  Again, our Supreme Court has been clear:  neither parties, the trial court, nor this court may extend or shorten the deadlines for filing an appeal.  (*Hollister, supra*, at p. 666.)  The deadlines are jurisdictional in nature, and are set legislatively.[3]  Parties may not alter the jurisdiction of California courts by private agreement, and, therefore, the parties' attempt to alter these deadlines in a settlement agreement is unenforceable.  (Rest.2d Contracts, § 178 ["A promise or other term of an agreement is unenforceable on grounds of public policy if … the interest in its enforcement is clearly outweighed in the circumstances by a public

---

[3]  The making of procedural rules in California is a task shared by the Judicial Council of California and the Legislature.  The California Rules of Court are promulgated by the Judicial Council.  (See Cal. Rules of Court, rule 1.3.)  Under the California Constitution, the Judicial Council is empowered to "adopt rules for … practice and procedure .…"  (Cal. Const., art. VI, § 6, subd. (d).)  However, those rules "shall not be inconsistent with statute."  (*Ibid.*)

policy against the enforcement of such terms."].)  Accordingly, the appeal of the summary adjudication motion is timely.

## II.    The Motion For Summary Adjudication Was Correctly Decided

### A.    *Pertinent Law*

"A trial court's order granting a motion for summary adjudication is reviewed de novo."  (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1471 (*Smith*).)  The same standards apply to a motion for summary adjudication as apply to a motion for summary judgment, the difference being that a summary adjudication motion only seeks summary resolution of a portion of a lawsuit, rather than the entirety of the complaint.  (See Code Civ. Proc., § 437c, subd. (f)(1) ["A party may move for summary adjudication as to one or more causes of action within an action, … if the party contends that the cause of action has no merit …."]; *id.*, subd. (f)(2) [noting motions for summary adjudication "proceed in all procedural respects as a motion for summary judgment"]; see *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

"'On appeal after a motion for summary judgment [or summary adjudication] has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.'"  (*Smith, supra*, 135 Cal.App.4th at p. 1472, quoting *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).)  "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law."  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."  (*Ibid.*, fn. omitted.)

Appellant brought claims under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) for discrimination on the basis of race, age, and

disability. Under FEHA, it is unlawful for an employer "because of the race, … physical disability, [or] … age … of any person, to refuse to hire or employ the person … or to bar or to discharge the person from employment .…" (*Id.*, § 12940, subd. (a).)

Analysis of all of appellant's discrimination claims here proceeds under the framework set out in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*) for claims of race discrimination, including his claims for discrimination based on age and disability. (See *Guz, supra*, 24 Cal.4th at p. 354 [discussing claims for age discrimination]; *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159–160 [disability discrimination].) While originally developed under federal discrimination law, California courts routinely refer to the *McDonnell Douglas* test, and federal cases interpreting it, for application to claims based on FEHA. (*Guz, supra*, at p. 354 ["California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination"]; see *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 214.)

The *McDonnell Douglas* test proceeds in three stages, which shift the burden between the parties, to reflect "the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially." (*Guz, supra*, 24 Cal.4th at p. 354.) Initially, the plaintiff must demonstrate a prima facie case of discrimination, which is designed to "eliminate at the outset the most patently meritless claims .…" (*Ibid.*) The burden at this stage is "'not onerous,'" but does require demonstrating "'"actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion .…' [Citation.]" [Citation.]'" (*Id.* at p. 355.)

While the specific elements required to demonstrate a prima facie case may vary depending on the factual circumstances of the case, the test generally requires a plaintiff to "provide evidence that (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he

8.

suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 355.)

Assuming the plaintiff successfully establishes a prima facie case of discrimination, the burden shifts to the defendant, as "a presumption of discrimination arises." (*Guz, supra*, 24 Cal.4th at p. 355.) This requires the employer-defendant to rebut the presumption by producing evidence "sufficient to 'raise[] a genuine issue of fact' and to 'justify a judgment for the [employer],' that its action was taken for a legitimate, nondiscriminatory reason." (*Id.* at pp. 355–356.) Put another way, the defendant must then "introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." (*St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 509.)

If the employer meets its burden at the second step, the burden then shifts back to the plaintiff, who is provided with "the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." (*Guz, supra*, 24 Cal.4th at p. 356.) "In an appropriate case, evidence of dishonest reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias," although it is ultimately the plaintiff's burden to persuade the finder of fact of the true reason for the adverse employment actions. (*Ibid.*)

Courts have cautioned that many cases in the employment context present issues of "intent, and motive, and hostile working environment," which are typically "not determinable on paper," making these cases "rarely appropriate for disposition on summary judgment." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286.) That said, where there is credible evidence the employment decision was made for lawful reasons, and plaintiff has no direct evidence of discrimination, plaintiff's task in opposing a motion for summary judgment becomes much more difficult. "[T]he great weight of federal and California authority holds that an employer is entitled to summary judgment

9.

if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." (*Guz, supra*, 24 Cal.4th at p. 361, fn. omitted.)

### B. The Trial Court Did Not Apply the Wrong Burden

Appellant first argues the trial court applied the wrong burden for summary adjudication. Appellant argues that, while the trial court correctly identified the *McDonnell Douglas* burden-shifting test, it failed to incorporate within it the standard burden of persuasion found when a party makes a motion for summary judgment or adjudication, which places the burden on the moving party. Appellant is incorrect.

It bears briefly observing that, because we review summary adjudication decisions de novo, and since we may "affirm if there is any basis for upholding the trial court's decision, 'whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings,'" this argument is irrelevant in any event. (*Pacific Merchant Shipping Assn. v. Newsom* (2021) 67 Cal.App.5th 711, 725.) Our task is to review the law and evidence anew. If we find grounds to uphold the trial court's decision in the record, even if the lower court's reasoning was unsound or its legal basis incorrect, we affirm. Nevertheless, we provide this explanation because it will aid in understanding the legal framework at issue here.

The *McDonnell Douglas* burden-shifting protocol is a test specifically used by courts for judging employment discrimination claims on summary judgment, not a test employed at trial to be used by the jury. (*Shelley v. Green* (9th Cir. 2012) 666 F.3d 599, 607 ["The *McDonnell Douglas* test is used on summary judgment, not at trial."]; *Costa v. Desert Palace, Inc.* (9th Cir. 2002) 299 F.3d 838, 855, fn. omitted ["it is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury"]; *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 202 ["the construct of the shifting burdens of proof enunciated in *McDonnell Douglas* is an analytical tool for use by the trial judge in applying the law, not a concept to be

understood and applied by the jury in the factfinding process"].) It is, in essence, an alternative formulation of the summary judgment standards particularly applicable to and derived for use in employment discrimination cases. While the *McDonnell Douglas* test provides a method of analyzing employment discrimination questions in the summary judgment context, "[t]he central issue is and should remain whether the evidence as a whole supports a reasoned inference that the challenged action was the product of discriminatory or retaliatory animus." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715; see *Guz, supra*, 24 Cal.4th at p. 361, fn. omitted ["the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory"]; *Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1185–1186 ["Ultimately, courts have recognized that whether a court applies the *McDonnell Douglas* framework or the mixed-motive analysis described in *Quigg* [*v. Thomas County School District* (11th Cir. 2016) 814 F.3d 1227], the relevant inquiry devolves to a showing of some discriminatory animus."].) Indeed, the California Supreme Court has noted that, notwithstanding any burden-shifting analysis, "[t]he ultimate burden of persuasion on the issue of actual discrimination remains with the plaintiff." (*Guz, supra*, at p. 356.)

Although our review is de novo, there is no indication the trial court failed to apply the correct standard here. The court correctly identified the *McDonnell Douglas* test, and applied it to the claims for age, disability, and race discrimination. In relation to each of appellant's discrimination claims, the trial court found he failed to produce admissible evidence sufficient to show even a prima facie case. The court also alternately found, even if appellant had presented a prima facie case, respondent had provided a legitimate, nondiscriminatory reason for termination, and appellant had failed

11.

to adduce sufficient admissible evidence to create a question of fact for the jury as to whether the reason was pretextual.

### C. Appellant Does Not Present Sufficient Evidence to Create a Question of Material Fact For the Jury

As we will now discuss, appellant fails to point us to admissible evidence that would warrant allowing any of the discrimination claims to proceed to a jury trial.

#### i. Summary Adjudication Was Appropriately Granted on Appellant's Claim of Age Discrimination

"A prima facie case of age discrimination requires evidence the plaintiff is over the age of 40, was performing satisfactorily and was discharged under circumstances giving rise to an inference of unlawful discrimination, i.e., others not over the age of 40 were retained or his job was filled by someone of comparable skill who was not over the age of 40." (*Gibbs v. Consolidated Services* (2003) 111 Cal.App.4th 794, 799; see *Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 321 (*Sandell*) ["In order to make out a prima facie case of age discrimination under FEHA, a plaintiff must present evidence that the plaintiff (1) is over the age of 40; (2) suffered an adverse employment action; (3) was performing satisfactorily at the time of the adverse action; and (4) suffered the adverse action under circumstances that give rise to an inference of unlawful discrimination, i.e., evidence that the plaintiff was replaced by someone significantly younger than the plaintiff."].)  While certain necessary elements have been set forth by prior courts, our Supreme Court has again made clear "[t]he specific elements of a prima facie case may vary depending on the particular facts." (*Guz, supra*, 24 Cal.4th at p. 355.)

In this case, it is undisputed appellant was terminated on January 15, 2019, and was 49 years old at the time of the adverse action.  Thus, we treat the first two elements of the test as established.

Concerning the third of the four factors, appellant points solely to his declaration, which states that he had "only positive performance reviews without disciplinary issues through my employment." While arguably self-serving, appellant's declaration does dispute whether he ever used a racial slur in relation to Jane Doe, which was the proffered reason he was fired. Giving appellant the benefit of the doubt, we assume this is sufficient to meet the third element of the prima facie test.

Dispositively here, however, appellant fails to point us to admissible evidence showing the fourth factor, i.e., other factual circumstances which give rise to an inference of unlawful discrimination on the basis of age. The sole circumstance appellant points to in order to suggest age discrimination occurred here is his eventual replacement with a younger employee, which appellant argues can lead to an inference of intentional age discrimination.[4] There are two related problems with this line of argument.

First, appellant points to only scant admissible evidence of the age of his replacement. Appellant cites two places in the record—his own declaration and that of his counsel, Howard Sagaser—purporting to establish that the person who eventually filled his position was younger than appellant. However, a review of the record shows the trial court sustained objections to this portion of Sagaser's declaration; since this decision is not challenged by appellant, this court does not consider that as part of the evidence before it on summary adjudication. (*Smith, supra*, 135 Cal.App.4th at p. 1472

---

[4] Appellant cites to a concurrence in *Guz* to suggest a 10-year age gap between the departing employee and a replacement employee is sufficient to allow a finding of age discrimination on that basis alone. This is not what the concurrence says. Justice Chin wrote separately in *Guz* to explain the plaintiff had "produced no credible evidence" he was discharged because of his age. (*Guz, supra*, 24 Cal.4th at p. 371 (conc. opn. of Chin, J.).) The mere fact the employer retained an employee who was 34, while discharging Guz, who was 49, and others in their 40's, was *not* sufficient, in Justice Chin's view, to establish a triable question on age discrimination. (*Id.* at pp. 376–377.) Justice Chin postulated, in an appropriate case where, for instance, an important contractual right vested at the age of 50, replacing a 49-year-old with someone even a few years younger might create an inference of age discrimination. (*Id.* at p. 377.) However, he noted, "no such evidence exists here," and rejected the suggestion that the retention of one employee in their 30's was sufficient to create such an inference. (*Ibid.*)

13.

[noting we "'consider[] all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained'"].)  The sole other evidence is appellant's declaration, which, assuming it is admissible,[5] says only, "I do not have all of the factual information regarding this matter, but I do know that I was replaced by a Hispanic person who was much younger than me."[6]

Second, and relatedly, this evidence standing alone is not sufficient to demonstrate a prima facie case of age discrimination here.  What constitutes sufficient evidence of discrimination necessitating jury resolution is based on the circumstances of each case.  (See *Sandell, supra*, 188 Cal.App.4th at p. 323 [noting whether inference sufficient to support prima facie case can be drawn from length of time between termination and replacement with younger employee varies based on circumstances of the case]; see also *Nakai v. Friendship House Assn. of American Indians, Inc.* (2017) 15 Cal.App.5th 32, 41 (*Nakai*); *Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 611 ["'The necessary elements of a prima facie employment discrimination case are not Platonic forms, pure and unchanging; rather they vary depending on the facts of a particular case.'"].)  And the

---

[5]    Respondent directs us in its brief to objections raised to appellant's declaration, but does not point us to where the trial court expressly ruled on each of those objections, citing instead to the minute order which references some of the objections, but does not clearly make a ruling on each of them.  Nor did our independent review of the record locate an indication that the trial court expressly ruled on each of these objections.  Where an objection is made in the trial court but not expressly ruled on, courts assume the objection was implicitly overruled, but is preserved for appeal "with the burden on the objector to renew the objections in the appellate court."  (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534, fn. omitted.)  Respondent does not renew its objections to appellant's declaration in this court, and so we do not reach the issue of whether the trial court correctly overruled these objections, and therefore assume this declaration is admissible.

[6]    Much of what appellant cites as "evidence" in his briefing here are, in fact, references to the briefing papers he filed in the trial court.  This is, of course, not evidence.  (See *Centex Homes v. St. Paul Fire & Marine Ins. Co.* (2018) 19 Cal.App.5th 789, 802; *Connolly v. Trabue* (2012) 204 Cal.App.4th 1154, 1166, fn. 5 [observing citations to pleadings "do not satisfy the requirement that a party to an appeal cite *evidence*"].)

14.

mere fact appellant was ultimately replaced by a younger employee is insufficient here to suggest discrimination.

The sole piece of evidence appellant offers to connect his termination to his age is his own statement that he was ultimately replaced by a younger employee. Even if appellant could show the younger employee was hired to *replace* appellant—as opposed to merely being hired after the fact simply because appellant's termination now left an unexpected vacancy in the staff that needed to be filled—courts have regularly found this fact is not sufficient to defeat summary judgment in and of itself. (See, e.g., *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 582 ["Replacement by a 'nonprotected' worker is only one part of a prima facie case."]; *Fagan v. N.Y. State Elec. & Gas Corp.* (2d Cir. 1999) 186 F.3d 127, 134 ["The replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination."]; *Futrell v. J.I. Case* (7th Cir. 1994) 38 F.3d 342, 348 ["Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination."]; *Thomas v. Corwin* (8th Cir. 2007) 483 F.3d 516, 529 [finding summary judgment appropriately granted to employer when employee "present[ed] no evidence, other than her replacement by a younger woman"]; *Birkbeck v. Marvel Lighting Corp.* (4th Cir. 1994) 30 F.3d 507, 512 ["[T]he mere fact of replacement by a younger employee is not dispositive of age discrimination. [Citation.] If it were, it would transform the [Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.)] into something akin to a strict seniority protection system."].)

In this case, appellant fails to cite to anything in the record that shows *when* this younger employee was hired to replace appellant. There is no evidence suggesting respondent had a younger person ready to assume appellant's position, and was simply biding its time until he left or could be fired. Nor is there evidence of how long it took to fill the position after a vacancy appeared. Even in the limited circumstances in which a court might conclude that the mere fact of replacement with a younger worker was

15.

sufficient to defeat summary judgment, the proximity of time must be very close. (See *Clark County School District v. Breeden* (2001) 532 U.S. 268, 274 [noting prior cases had held a period of three or four months was too long, and an action after significant delay "suggests, by itself, no causality at all"].) The mere fact that the personnel vacancy left by appellant's termination was eventually filled with an employee who happened to be younger than him creates no inference of age discrimination here, standing alone.

If we were to nonetheless find a prima facie case had been stated, we would move to step two of *McDonnell Douglas*, which asks whether the employer has a nondiscriminatory reason for the adverse action. Here, as with the other discrimination claims, respondent supplied evidence that its reason for terminating appellant was his use of a racial slur toward a colleague. Appellant does not dispute that this would be a nondiscriminatory reason for termination.

Moving to the third step of *McDonnell Douglas*, the burden again returns to the plaintiff to attack the proffered reason and demonstrate why it is pretext, or offer any other evidence of discriminatory motive. Even assuming we found sufficient evidence to move to step three of the test, we would not find enough evidence on the question of discriminatory motive to warrant jury resolution. Appellant's main criticism of his former employer is with the veracity and accuracy of the results of the investigation. However, discrimination law does not protect against poor decisionmaking by employers; it protects against *unlawful discriminatory* decisionmaking by employers. (See, e.g., *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005 (*Hersant*) ["'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'"].)

In this case, the director of human resources, Torres, interviewed another employee, Adam P., who told Torres he had personally heard appellant use the racial slur

to describe Doe. Torres also spoke to appellant during this process, and asked him whether he had used such language in relation to Doe. As Torres described:

> "[F]rom the moment I met with [appellant], he was very agitated, upset. And he said that he didn't know what I was talking about. I asked him, you know, have you ever called her [a] purple-headed gorilla? And he exploded and he said, F this, you know, s[***] that. And he was very upset. And I said, look, calm down. I'm just trying to get your side of the story to see, you know, what happened, you know. And he goes, who the hell is saying that about—you know, about me? And so I was very honest. I told him that [Adam P.] was saying that he had heard him several times say that. And he was talking to me about, you know, that he was raising biracial kids. And I said, that's irrelevant. I said, I'm doing the same thing, you know. I said, I got Mexican, you know, black children. I said, so—I said, I just want to know if maybe this was said playing. I said, do you guys—I said, I'm trying to figure out my—your relationship with [Doe]. I said, you know, sometimes people, you know, play around and maybe it was a comment that got out of line or everything. And I was not able to get much out of him because he was very, very irritated. I could just not quite reach him and—and calm him down."

Torres testified he told appellant he would give him a few days to calm down and they could talk again. However, appellant was still "very upset" when Torres tried to talk to him a few days later. Ultimately, Torres testified he believed Adam P. was telling the truth and appellant had used a racial slur toward another employee, and that pursuant to respondent's written policies, this offense could result in immediate termination. Shortly thereafter, Torres terminated appellant's employment.

Appellant does not point to any evidence in the record that creates a material dispute as to whether Torres's account of why he terminated appellant is *genuine*.[7]

---

[7] In the trial court below, appellant "Disputed" the following factual statement: "Based on Mr. Torres' interview of [Adam P.], Mr. Torres believed [Adam P.] was telling the truth when he stated that he personally heard [appellant] refer to Ms. Doe as a purple headed gorilla, or similar words to that effect." Specifically, appellant stated: "Disputed and irrelevant. Disputed as all the statements were hearsay and [appellant] denied making the statement." However, the statements of Adam P. recalled by Torres were not introduced for the truth of the matter asserted on summary judgment (i.e., whether appellant *in fact* made these racial slurs), and therefore were not hearsay. Rather, they were asserted to show their effect on the listener, i.e., to explain Torres's motivation for terminating appellant. Therefore, hearsay objections are irrelevant.

Rather, appellant disputes whether it was the *correct* decision, maintaining that he did not, in fact, use a racial slur toward his colleague. However, *only* the right to nondiscrimination is protected by antidiscrimination laws. These laws do not provide any right to have one's employer make wise personnel decisions. (See *Guz, supra*, 24 Cal.4th at p. 358 ["[I]f nondiscriminatory, [an employer's] true reasons need not necessarily have been wise or correct."]; *Hersant, supra,* 57 Cal.App.4th at p. 1005 ["'The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'"]; see also *Nakai, supra*, 15 Cal.App.5th at p. 41.) Appellant, as an at-will employee, has no right under antidiscrimination law to be terminated only for meritorious reasons, or even for correct ones; rather, he has a right *not* to be terminated on the basis of protected characteristics.

This is also why appellant's argument that respondent's investigation was not sufficient is unpersuasive. Appellant argues the employee with whom Torres confirmed appellant's use of racial slurs—Adam P.—was biased against him, and a sufficient investigation would have shown Adam P. resented appellant because appellant exposed to Adam [P.'s] wife an affair Adam P. was having at work.[8] However, even assuming appellant's account is true—i.e., assuming Torres's investigation was insufficient because a complete investigation would have shown Adam P. was lying, and that appellant would not have been fired but for Torres's failure to uncover Adam P.'s lies—it is insufficient to

---

Further, whether appellant denied making the statement at all is also irrelevant. What matters is whether Torres's belief was genuine, not whether it was correct. And, as discussed throughout this opinion, appellant points to no facts to dispute Torres's belief was genuine.

[8] Appellant also criticizes Torres for not "verif[ying]" Adam P.'s account, although it is unclear what appellant believes would have been sufficient verification.

18.

create a relevant dispute of fact. Respondent cannot be held liable under antidiscrimination laws merely because it reached the wrong decision.

Because of the emphasis placed on this issue at oral argument, we explain further. *Adam P.'s* motives are simply not relevant here; *Torres*'s are. Adam P. did not make a termination decision for respondent. Torres did. The only relevance Adam P.'s motives or bias has is the extent to which they speak to Torres's motivations, which are what matter in deciding whether respondent acted with discriminatory animus. The evidence provided by appellant shows, at best, that Adam P. may have been *personally* biased against him. However, there is no nonspeculative way in which *Adam P.'s* personal dislike of appellant suggests *Torres* had a discriminatory motivation. A jury could not reasonably infer Torres fired appellant because of his age (or race or disability) simply because he knew Adam P. personally disliked appellant for disclosing his affair. The two are unrelated. "'When opposition to a motion for summary judgment is based on inferences, those inferences must be *reasonably deducible from the evidence*, and not such as are derived from speculation, conjecture, imagination, or guesswork.'" (*Waschek v. Department of Motor Vehicles* (1997) 59 Cal.App.4th 640, 647, italics added.) Appellant offers no explanation as to how Adam P.'s bias shows Torres was motivated to act against him because of a protected status. The *only* question here is whether respondent terminated appellant for a discriminatory reason, not whether Torres was correct or could have done a better job. Appellant points us to no evidence in the record which indicates Torres's reason for terminating appellant was not genuine, even if it was misguided.

While appellant may find it unfair for him not to receive a jury trial on whether he made the offensive remark that got him fired, this simply is not what antidiscrimination laws protect. Antidiscrimination laws do not limit terminations to those having meritorious reasons. Rather, the only requirement is that the termination *not* be based on a discriminatory reason. Neither an incorrect decision nor the failure to use best practices

19.

in a workplace investigation is made unlawful by antidiscrimination law. It is only when the investigation is so patently deficient a jury could reasonably infer based on those deficiencies that the investigation was mere pretext for a secretly held discriminatory desire against the employee that those deficiencies become at all relevant. (*Stallings v. Hussmann Corp.* (8th Cir. 2006) 447 F.3d 1041, 1052 [noting courts do not "'sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent those judgments involve intentional discrimination'"]; see *Humphries v. CBOCS West, Inc.* (7th Cir. 2007) 474 F.3d 387, 407 [finding that "merely pointing to an employer's shoddy investigatory efforts" is not sufficient to establish pretext, without other circumstances that suggest intentional discrimination]; *E.E.O.C. v. Total System Services, Inc.* (11th Cir. 2000) 221 F.3d 1171, 1176 [rejecting argument that employer must do more than prove its reason for discharge was honest].)

The investigation here was not so deficient as to create an inference of discrimination. Torres interviewed all of the people who Doe identified by name with a discrete complaint of inappropriate behavior.[9] This included appellant, whom Torres gave the opportunity to tell his side of the story. Appellant reacted very defensively, and Torres apparently concluded, between Adam P.'s statement, which he deemed credible,

---

[9] Torres noted in his deposition that many of the complaints received from Doe were vague in nature. He stated:

> "There was [*sic*] no real names or anything that she could give me as to, look, I heard it myself directly. Even when she said she heard it, I said, when did you hear it and when was it said? And so she gave me a story about being the purple-headed gorilla, that she had been called that, that Jesus Torres had gone to her because Adam [P.] had gone to him. And so that was the most concrete, you know, issues that she had where she had actual, you know, individuals. The rest of them, the people wouldn't give her no ride and her speculation of her not being, you know, given rides. That was just—that was—that's not here—you know, here nor there. So there was many, many, many, many different topics that we copy—that we covered."

20.

and appellant's dramatic reaction, that appellant had made the statement and should be terminated. Even if Torres could have done more to ferret out Adam P.'s purported bias, there simply is no evidence indicating his failure to do so was motivated by discriminatory animus. Nothing about the investigation is so inherently insufficient that it suggests pretext or discrimination.

Appellant also suggests the investigation into other employees was not as searching as it was with him, and this suggests discrimination, stating "Torres chose not to investigate Dora [V.] making derogatory statements or the allegation that Dora [V.] was having an affair with Adam [P.]" However, the written statement submitted by Doe shows most of her complaints were either (1) not actionable, because they involved possibly rude, but not unlawful or prohibited, conduct, or (2) included insufficient details to permit investigation, because they either did not identify the person who used the racial slur, or did not provide any information about when, where, or in what context the racial slur was purportedly used. Indeed, the only comment in the complaining letter from Doe about Dora V. is that Doe felt she had "been ridiculed and defamed by Dora [V.]," and Dora V. once said Doe "deserve[d] a little sock." The former statement is far vaguer than the accusation levied against appellant, which identified a specific racially-charged statement, a time and place the statement was made, and a witness who heard the statement being made. Whatever the latter statement means, it is not apparently directed at any of Doe's protected characteristics. The failure to conduct a more searching investigation does not establish a factual question about pretext when it is obvious there was little to investigate, either because no other detailed complaint was provided to Torres or because the behavior complained about was not as serious or legally actionable as allegations of racial slurs.

In sum, reviewing the record de novo, we find appellant did not make out a prima facie case of age discrimination. Even if he had, respondent presented a nondiscriminatory reason for appellant's termination. Thus, if we proceeded to step three

21.

of *McDonnell Douglas*, there was not sufficient admissible evidence presented to create a factual question for the jury about whether defendant had discriminated against him on the basis of age, given there is no evidence showing Torres's motivation for terminating appellant was not genuine, i.e., that he did not actually believe appellant had violated workplace policy. At best, there is evidence Torres could have done a better investigation, which on these facts is not actionable under antidiscrimination laws.

  ii. <u>Summary Adjudication Was Appropriately Granted on Appellant's Claim of Race Discrimination</u>

Appellant also argues the trial court erred in concluding he had not established a prima facie case of race discrimination. Appellant points to two pieces of evidence he believes establish that his termination was due to the fact he is Caucasian: (1) the disparate investigation of himself, as opposed to others named in the complaint; and (2) statistical racial disparities among the employees of respondent. As with his argument on age discrimination, appellant's contentions here are similarly unavailing.

Courts apply effectively the same test for all discrimination claims under FEHA: the plaintiff must establish he is (1) a member of a protected class; (2) he is qualified to do his job or has been performing satisfactorily; (3) he suffered an adverse employment action; and (4) the circumstances are in some manner indicative of the adverse action being motivated by the status of the plaintiff as a member of the protected class. (See *Guz, supra*, 24 Cal.4th at p. 355; *Sandell, supra*, 188 Cal.App.4th at p. 321; *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1246; *Gibbs v. Consolidated Services, supra*, 111 Cal.App.4th at p. 799; see also *Cornwell v. Electra Cent. Credit Union* (9th Cir. 2006) 439 F.3d 1018, 1031; *Aragon v. Republic Silver State Disposal, Inc.* (9th Cir. 2002) 292 F.3d 654, 658 (*Aragon*).) Since the parties treat several of these elements as undisputed, we assume without deciding appellant has demonstrated he is a

22.

member of a protected class.[10]  Termination, again, is obviously an adverse employment action.

We will assume without deciding that appellant made a prima facie case under step one of *McDonnell Douglas*'s test.  As mentioned above, moving to step two, respondent proffered evidence of a nondiscriminatory reason for termination—that appellant himself actually engaged in discriminatory behavior—which no one disputes would be a permissible reason to terminate an employee.  We thus proceed to examine whether, under step three of *McDonnell Douglas*, appellant has identified sufficient evidence to show Torres's reason—and therefore respondent's reason—for terminating him was actually motivated by his race.

We discussed the argument related to Torres's purportedly disparate investigation above, but elaborate here, since appellant connects it most clearly to his claim of race discrimination.  For context, we provide the entirety of the written complaint submitted by Doe, which initiated Torres's investigation:

> "I'm reporting conduct by CCF Fresno staff members of violating my right[s] by discriminating against me because of the color of my skin, ethnic background, and race.  I work in an environment where I'm isolated, gossiped about, and ridiculed with derogatory racial slurs by staff members from Villa Martinez, Ross Gardens, Plaza Mendoza, past and current staff

---

**10**     Some courts have held employment law protects from discrimination "any racial group, whether minority or majority." (*Aragon, supra*, 292 F.3d at p. 659.)  Other courts have noted that such a framing essentially nullifies the first element, because "everyone has a race (or sex, or national origin)." (*Hague v. Thompson Distribution Co.* (7th Cir. 2006) 436 F.3d 816, 820.)  They have therefore required that, in so-called reverse discrimination suits involving claims of discrimination by a traditionally privileged person—i.e., a Caucasian or a man—the plaintiff "'show "background circumstances" sufficient to demonstrate that the particular employer has "reason or inclination to discriminate invidiously against whites" [or men] or evidence that "there is something 'fishy' about the facts at hand."'" (*Ibid*., quoting *Ineichen v. Ameritech* (7th Cir. 2005) 410 F.3d 956, 959.)  However, it is unclear how this formulation would not simply fit within the fourth element of a prima facie test, which is to show *some* circumstances justifying an inference that unlawful discrimination caused the adverse employment action.  Since the parties do not dispute this element, we leave further precise delineations of this test for another day.

23.

member[s] from Casa Velasco Apartments (CV). I am described as the nigger manager, nigger and other vile descriptions by [appellant] and Ashley at Plaza Mendoza. I have been ridiculed and defamed by Dora [V.,] former assistant manager at Casa Velasco Apartment (CV) and current Ross Gardens Apartment Manager to personnel at Casa Velasco, Villa Martinez, Plaza Mendoza and Ross Gardens. This activity is shared with venders [*sic*] and the venders [*sic*] come to the property and gossip with CV staff member[s] about what is said about me. I'm discussed by Adam [P.] to CV staff members.

"Activities include staff members at CV routinely contacted within a month of when they start and asked if they like me and derogatory remarks are usually made about me. When there are group activities and Fresno managers have to travel I'm usually told there is no room to travel with them. I have personally heard Dora [V.] ridicule and defame me to CV staff members. I'm ridiculed and defame[d] in public and with venders [*sic*] by CCF Fresno Staff members. The latest was at a Christmas party on 12/7/2018 with Art Air Conditioning. They spent a good amount of time ridiculing, making derogatory remarks and defaming my character. Comments included, 'Good she didn't show up.' (Ronnie). When they were asked if they wanted to drink Sake, Dora [V.] said I deserve a little sock, and [other] comments made was maybe that they should buy [me] a big rat trap ([appellant]). The conversation about me went on for a while. All were in their CCF uniforms discussing and ridiculing me in derogatory demeaning manner in a restaurant. Even after one CV member was written up the ridicule, comments and derogatory comments did not stop. Staff members from CV stated that comments made about my character were very inappropriate.

"On 12/18/2018 Jesus Torres came to Casa Velasco mangers' office to inform me of a conversation he had with Adam [P.] Jesus Torres indicated on Tuesday 12/18/2018 around 3:22PM Adam [P.], CCF Laundry Technician came to Casa Velasco Apartments laundry room and began [i]nquiring about 'who snitched?', about the events that took place at a Christmas gathering on 12/7/2018. Adam stating to Jesus that [appellant] from Plaza Mendoza had referred to me as the 'Purple Gorilla'."

As is apparent from the written statement, the bulk of the complaints made about Doe's coworkers were that they treated her disrespectfully or were mean to her. While ridiculing coworkers is not laudatory behavior, it was apparently largely based on personal dislike and not a protected characteristic, and therefore is not necessarily

proscribed by law. (See *Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 867 ["[The Plaintiff] also relies on her deposition testimony that Father Locatelli was 'abusive' toward her when he met her in public. According to [the plaintiff], instead of saying 'Hi' or asking 'How are you,' he would say, 'What do you want?' But [the plaintiff] does not explain how these statements relate to her ethnicity or national origin."].) It is therefore unsurprising Torres, as human resources director, spent little time investigating vague claims that other staff members did not like Doe and, instead, focused on those concrete examples that showed potentially unlawful racial animus in the workplace. After all, failing to address racial animus in the workplace could, in the appropriate circumstances, subject respondent as an entity to liability from Doe. (See Gov. Code, § 12940, subd. (j)(1); *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 707 ["When the harasser is a nonsupervisory employee, employer liability turns on a showing of negligence (that is, the employer knew or should have known of the harassment and failed to take appropriate corrective action)."].)

Similarly, it appears Torres also did not spend significant time investigating complaints made in the above statement that *did* concern protected characteristics, when those complaints lacked significant details concerning when, where, and in what context the statements were made. However, this apparently *benefitted* appellant. No one points us to any evidence in the record that Torres seriously investigated allegations that appellant referred to Doe as "nigger" or "nigger manager," even though those racial slurs are significantly harsher and more insulting than the other one more concretely attributed to him. Similarly, appellant's alleged use of these considerably more serious racial slurs did not factor into his termination. This is because, as Torres explained in his deposition, those allegations were not concrete or detailed. Rather, Torres investigated the one complaint in the statement that had a discernible date and line of witnesses who could speak to whether they heard the inappropriate comments made. This is in no way indicative of pretext or a desire to discriminate against appellant on the basis of his race.

25.

Appellant has pointed us to no evidence Torres's motivation in the manner of conducting the investigation was based on race, rather than simply on the amount of information from which an investigation could begin. In fact, Torres's failure to investigate other, more serious allegations of racially charged inappropriate behavior in the workplace meant more serious allegations against *appellant* were not investigated. This does not point toward, but rather away from, the idea that Torres singled appellant out.

Appellant also argues on appeal that respondent's overall workforce demographics suggest a disproportionate racial makeup of its staff, and that this would be a reason to find respondent's motive pretextual. However, appellant cites no admissible evidence of the racial demographics of respondent's workforce. Statements contained in the declarations of appellant's counsel were objected to in the trial court, and the trial court sustained the objections, which appellant does not challenge on appeal. Otherwise, appellant's citations on this point are to the briefing and arguments of counsel below, which are not evidence. Lacking admissible evidence, this argument must fail. (Code Civ. Proc., § 437c, subd. (d) ["Supporting and opposing affidavits or declarations … shall set forth admissible evidence .…"]; accord, *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536, 541–543.)

Even if there were admissible evidence that the racial demographics of respondent's workforce do not match those of the surrounding area or state, this would not be sufficient, in and of itself, to show a prima facie case of employment discrimination. Statistical evidence of racial demographics is most commonly employed in so-called "disparate-impact" cases, in which a plaintiff shows a facially neutral employment practice that nevertheless had a significantly discriminatory impact on a particular racial group. (*Connecticut v. Teal* (1982) 457 U.S. 440, 446–447; *Int'l Bhd. of Teamsters v. United States* (1977) 431 U.S. 324, 335–336, fn. 15 (*Teamsters*) [discussing

differences between disparate impact and disparate treatment cases];[11] *Ibarbia v. Regents of University of California* (1987) 191 Cal.App.3d 1318, 1327.) But appellant does nothing to tie the purported difference in racial demographics amongst respondent's employees to the application of a facially neutral policy relevant to this case. (See *Freyd v. University of Oregon* (9th Cir. 2021) 990 F.3d 1211, 1224 [noting a plaintiff in a disparate impact claim must show "'a specific employment practice'" that "'causes a significant discriminatory impact'"]; *Stout v. Potter* (9th Cir. 2002) 276 F.3d 1118, 1124 ["Plaintiffs generally cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact."].) Even if the evidence were admissible, and

---

[11]    Appellant states the United States Supreme Court held in *Teamsters* that demonstrating a gross disparity between the racial composition of a workforce and the surrounding demographics of the area "was enough to establish the prima facie case of racial discrimination." This is incorrect. In *Teamsters*, the court *did not* hold statistical evidence was always (or even generally) sufficient on its own to establish a prima facie case of employment discrimination. Instead, the court said, "We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish a prima facie case of racial discrimination in jury selection cases, [citations]. Statistics are equally competent in proving employment discrimination. We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." (*Teamsters, supra*, 431 U.S. at pp. 339–340, fn. omitted.) Indeed, the court noted in *Teamsters*, "this was not a case in which the Government relied on 'statistics alone.'" (*Id.* at p. 339.) "The Government bolstered its statistical evidence with the testimony of individuals who recounted over 40 specific instances of discrimination." (*Id.* at p. 338.) "Although statistical data may, in a proper case, be sufficient alone to raise a prima facie case," this is not true here. (*Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30* (9th Cir. 1982) 694 F.2d 531, 552.)

Regardless, statistical differences amongst maintenance workers do not point to discriminatory treatment of appellant in this case. Disparate impact and disparate treatment cases are inherently different; the former focuses on a race-neutral practice that nevertheless has a discriminatory effect, whereas the latter concerns cases in which the employer acted with actual discriminatory motive. Appellant has not made any showing that there even were other similarly situated maintenance employees, i.e., employees that had been documented by human resources to have used racial slurs in reference to their coworkers. Therefore, disparate impact arguments are not apropos.

even if appellant were alleging a disparate impact case (which he does not appear to be), he still would have failed to show there is a jury question here.

In sum, even assuming appellant presented sufficient admissible evidence to establish a prima facie case of racial discrimination at *McDonnell Douglas*'s first step, respondent supplied evidence of a nondiscriminatory reason for his termination in the second step of the test. Moving therefore to the third step of the *McDonnell Douglas* test, no reasonable jury could find the proffered legitimate reason was pretextual, on the evidence presented because, again, Torres's investigation was not so deficient as to suggest pretext and, in fact, also ignored much more serious allegations of appellant's behavior.

### iii. Summary Adjudication Was Appropriately Granted on Appellant's Claim of Disability Discrimination

Appellant argues that he established a prima facie case for disability discrimination. Again, however, we find to the contrary in our de novo review. Even presuming appellant could demonstrate a prima facie case of disability discrimination, respondent presented evidence of a nondiscriminatory reason for his termination. Thus, on step three of the *McDonnell Douglas* test, we find appellant has not shown sufficient evidence to create a triable issue of fact as to whether respondent's motivation was discriminatory.

Again, since it is not disputed, we assume appellant has a disability and is a member of a protected class. Termination is obviously an adverse action. And we assume for the sake of argument appellant was replaced by an employee who was not dyslexic, although evidence of this in the record appears questionable.[12] We therefore

---

[12] Again, the sole admitted evidence we are directed to in this regard is appellant's statement in his declaration that, "To my knowledge, the person who replaced me was Hispanic and did not have a disability." It is not apparent from the declaration how appellant would know whether his replacement was dyslexic.

assume appellant satisfied step one of *McDonnell Douglas*, and set forth a prima facie case. As discussed above, respondent has presented evidence of a reason unrelated to appellant's disability for his termination, satisfying step two. We therefore move to step three of *McDonnell Douglas*, where we find appellant has not presented sufficient evidence to create a triable question of fact for a jury.

The sole argument appellant points us to as showing pretext or disability discrimination despite its nondiscriminatory reason for termination is that respondent knew appellant had dyslexia, and could not read or write, and yet Torres asked appellant to provide a written statement in response to the allegations. Appellant states artfully "[n]o accommodation was made," but points to no evidence in the record suggesting an accommodation was requested.

Appellant somewhat confuses the law of disability discrimination with the law concerning reasonable accommodations, and we will pause to elucidate some of the differences. Subdivision (a) of Government Code section 12940 makes it unlawful for an employer to "refuse to hire or employ," or "to bar or to discharge," a person based on their physical or mental disability. Subdivision (n) of section 12940 states it is unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant *to determine effective reasonable accommodations*, if any, *in response to a request for reasonable accommodation by an employee* or applicant with a known physical or mental disability or known medical condition." (Italics added.) "The 'interactive process' required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively." (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1195.) "Ritualized discussions are not necessarily required." (*Ibid.*)

Unless the need for an accommodation is obvious, an employee must generally request the reasonable accommodation. (*Scotch v. Art Institute of California* (2009) 173

Cal.App.4th 986, 1013 (*Scotch*) ["The employee must initiate the process unless the disability and resulting limitations are obvious."]; *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54 ["First, the employee must request an accommodation."]; see *Miller v. National Casualty Co.* (8th Cir. 1995) 61 F.3d 627, 629–630.)[13] "[I]t is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability." (*Taylor v. Principal Financial Group, Inc.* (5th Cir. 1996) 93 F.3d 155, 164.) The law "requires employers to reasonably accommodate limitations, not disabilities." (*Ibid.*; see *Scotch, supra*, at p. 1013.)

This is, of course, not to say an employee bears the sole responsibility of identifying reasonable accommodations, or even that he must request a specific accommodation. (See, e.g., *Bax v. Doctors Medical Center of Modesto, Inc.* (9th Cir. 2022) 52 F.4th 858, 869.) Rather, what is required is that the employer understand the employee is having a particular problem performing a necessary job function. (See *Scotch, supra*, 173 Cal.App.4th at p. 1013; see *Morisky v. Broward County* (11th Cir. 1996) 80 F.3d 445, 448 ["Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the [Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.)]."].) The employer's understanding of the employee's limitations is what puts it on notice that it must begin the interactive process.

This is entirely separate from the question of disability discrimination, the test for which on summary judgment again follows the common *McDonnell Douglas* factors identified above. (*Lin v. Kaiser Foundation Hosps.* (2023) 88 Cal.App.5th 712, 722.) In

---

[13]  "Because the FEHA provisions relating to disability discrimination are, in fact, based on the [Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.)] and other federal law, decisions interpreting federal antidiscrimination laws are relevant in interpreting the FEHA's similar provisions." (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 235.)

some instances, the question of whether a reasonable accommodation was available or was made may be relevant to a determination of disability discrimination, depending on the factual circumstances of the case. (See *Sanders v. Arenson Products, Inc.* (9th Cir. 1996) 91 F.3d 1351, 1353, fn.1; *Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 39–40, 52–53.) However, this is not so here.

In this case, it was undisputed appellant told respondent when he was hired that he "had difficulty reading and writing." It is also undisputed appellant "requested only one accommodation to allow him to perform his work duties—assistance with reading maintenance work orders." It is undisputed respondent provided this accommodation to appellant.

Fatal to appellant's argument that asking him to write a written statement was a circumstance indicative of disability discrimination is the complete lack of evidence that appellant was terminated because he failed to write a statement. There simply is no evidence appellant was terminated for disobeying a directive to write a statement about the incident, and appellant does not even suggest otherwise. No evidence is identified in the record suggesting Torres or any other agent of respondent told appellant he could not have someone else engage in the physical act of transcribing appellant's spoken words, or that they would not listen to appellant's oral account of what happened. In fact, Torres attempted to get an oral account of appellant's side of the story on more than one occasion, and appellant apparently reacted so defensively each time that Torres was unable to obtain a useful statement.

Appellant was not fired for failing to give a written statement. Therefore, since the relevant disability here made him unable to write, he was ipso facto not fired because of his disability. The reason given for respondent's firing was that he had made a racial slur against a colleague. While appellant disagrees with whether this was the *correct* decision—appellant continues to insist the material factual issue for the jury to decide is whether he made the statement attributed to him—he points to no evidence showing

31.

Torres terminated appellant because of his failure to supply a written statement, which is the only part of this connected to his disability. As such, no reasonable jury could conclude these factual circumstances are indicative of disability discrimination.

Additionally, nothing in the record shows respondent should have known appellant was unable to write *any* response even when the subject matter was uncomplicated, i.e., whether appellant had ever referred to a particular colleague by a racial slur. "Difficulty" reading and writing is not synonymous with total illiteracy, and it is not obvious from the evidence presented that respondent should have known appellant could not write even a basic statement about whether he made the comments ascribed to him. Appellant also agrees he did not ask for any accommodation in relation to this.

There is no evidence respondent failed to appropriately accommodate appellant's disability, let alone that respondent's termination decision was made "because of" appellant's disability, rather than the racial slur attributed to him. Again, courts do not sit to review the correctness or wisdom of personnel decisions, only whether the decisions were unlawful because they were discriminatory. Thus, we assume appellant showed a prima facie case of disability discrimination, in response to which respondent proffered a nondiscriminatory explanation. Following this, appellant presents no evidence to show the proffered explanation—that appellant was terminated due to his use of a racial slur toward a colleague—was pretextual, and that he was instead fired because he could not read or write. Summary adjudication was appropriately granted as to the disability discrimination claim.

iv. Because Appellant's Substantive Discrimination Claims Were Dismissed, His Derivative Claims Were Also Appropriately Dismissed

Appellant notes his claim for wrongful termination in violation of public policy was "properly tethered" to his "claim to race, age, and disability discrimination" under FEHA. Similarly, appellant's argument concerning his failure to prevent discrimination

32.

and retaliation claims is that his "underlying claims have merit." Since these three claims are apparently entirely derivative of the age, race, and disability discrimination claims we have found were appropriately dismissed, these claims were also appropriately dismissed.

### D. Appellant's Request For Punitive Damages Was Appropriately Stricken

Appellant next argues the trial court erred in striking any claims for punitive damages from the case. First, appellant argues that, because he established a prima facie case for disability discrimination, Torres's failure to accommodate appellant's claimed dyslexia creates a basis for punitive damages. Given our conclusion above that appellant did not present admissible evidence sufficient to establish a prima facie case of disability discrimination, this argument is similarly unpersuasive and provides no basis to reverse the trial court's decision.

Appellant also suggests punitive damages are available for the claim brought under Business and Professions Code section 17200. This is wrong. The remedies available for a section 17200 claim are set by statute, and include injunctive relief and restitution, the latter of which is described as orders that "may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (*Id.*, § 17203.) Our Supreme Court has held courts are not authorized to award nonrestitutionary forms of monetary damages for section 17200 claims, even where the award is equitable in nature, such as disgorgement of profits. (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143–1148 [describing legislative and judicial history relevant to Bus. & Prof. Code, §§ 17200 and 17203, and concluding nonrestitutionary disgorgement was not an available remedy].) Based on this, courts have widely held punitive damages are unavailable for a section 17200 claim. (See *Clark v. Superior Court* (2010) 50 Cal.4th 605, 610 ["Not recoverable [under section 17200] are damages, including punitive damages and increased or enhanced damages."]; *Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 196 ["A UCL claim cannot serve as the basis for punitive damages."];

see also *Novick v. UNUM Life Ins. Co. of America* (C.D.Cal. 2008) 570 F.Supp.2d 1207, 1210, fn. 2; *In re Wal-Mart Stores, Inc. Wage and Hour Litigation* (N.D.Cal. 2007) 505 F. Supp.2d 609, 620 ["[I]t is settled law that punitive damages are not available under section 17200."].) We follow this settled law, and find appellant's Business and Professions Code section 17200 claims provide no basis to conclude the trial court was incorrect in dismissing any claims for punitive damages.

### III.    The Trial Court Did Not Err in Awarding Sanctions Against Appellant and Appellant's Counsel

Lastly, appellant appeals the award of sanctions against him and his counsel, following a failed motion to disqualify counsel for certain third party witnesses. Appellant does not appeal the denial of the motion to disqualify, but rather argues sanctions should not have been imposed because there was substantial justification for the motion under Code of Civil Procedure section 2023.030, subdivision (a).

We review the award of discovery sanctions under section 2023.030 of the Code of Civil Procedure for abuse of discretion. (*Victor Valley Union High School Dist. v. Superior Court* (2023) 91 Cal.App.5th 1121, 1137–1138; *City of Los Angeles v. PricewaterhouseCoopers, LLC* (2022) 84 Cal.App.5th 466, 497, review granted Jan. 25, 2023, S277211; *Kwan Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57, 73.) The test for abuse of discretion in the discovery context "is whether the trial court's decision exceeded the bounds of reason." (*Cornerstone Realty Advisors, LLC v. Summit Healthcare REIT, Inc.* (2020) 56 Cal.App.5th 771, 789; see *Sabetian v. Exxon Mobil Corp.* (2020) 57 Cal.App.5th 1054, 1084 ["'The trial court's decision will be reversed only "for manifest abuse exceeding the bounds of reason."'"].)

Appellant moved in the trial court to disqualify certain third party counsel for respondent's employees identified as witnesses in the lawsuit because respondent had paid for the provision of that counsel to those employees. The court denied the motion, apparently finding appellant lacked standing to bring the motion and because there was a

lack of any authority to support disqualification in this instance. Finally, noting appellant had sought sanctions pursuant to section 2023.030 of the Code of Civil Procedure for misuse of the discovery process, and observing that code section directs the awarding of reciprocal sanctions for a proponent that brings and loses a motion, unless there is substantial justification for the motion, the court awarded $2,500 in sanctions to respondent, payable by appellant and/or his counsel.

Appellant makes no compelling case that the trial court erred. We need go no further than standing. Generally, standing, which is implicit in disqualification motions, requires the complaining party seeking disqualification to have, or previously have had, an attorney-client relationship with the attorney sought to be disqualified. (*Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1356 (*Great Lakes*).) Standing is particularly important in disqualification motions because it helps prevent them from being used tactically or strategically to burden opposing parties and gain leverage over them in a manner unrelated to the merits. (See *id.* at p. 1358 ["[I]mposing a standing requirement for attorney disqualification motions protects against the strategic exploitation of the rules of ethics and guards against improper use of disqualification as a litigation tactic."]; *Sharp v. Next Entertainment Inc.* (2008) 163 Cal.App.4th 410, 434.)

In very limited instances, courts have suggested individuals lacking any type of attorney-client relationship may still be able to bring disqualification motions, where the moving party had some other expectation of confidentiality due to a legal duty owed to them. (See *DCH Health Services Corp. v. Waite* (2002) 95 Cal.App.4th 829, 832–833.) The court in *Great Lakes* did recognize the existence of this minority view, so long as the nonclient has some sort of relationship with the attorney justifying it, i.e., a "'personal stake'" in "a legally cognizable interest which is concrete and particularized, not hypothetical." (*Great Lakes, supra*, 186 Cal.App.4th at pp. 1357, 1358.) However, a nonclient's desire to "ensure the integrity of the process and the fair administration of justice" is not sufficient to create standing to move for disqualification. (*Id.* at p. 1358;

35.

see *Moreci v. Scaffold Solutions, Inc.* (2021) 70 Cal.App.5th 425, 442 [noting an "'abstract interest in winning or losing this litigation is not legally cognizable'" and does not support standing].)

Appellant makes no representation he was ever a client of the third party attorney he sought to disqualify, or that that attorney owed him any type of legal duty of confidentiality or loyalty under some other relationship. So far as we can tell, appellant's argument for standing is exactly what has been unanimously rejected by prior courts: a desire to ensure the integrity of the litigation process and the fair administration of justice. Appellant's counsel, at the hearing in the trial court on this matter, said only, "I believe standing does exist here simply because the acts of [respondent] here have frustrated discovery and in effect shielded witnesses from [appellant]. And I think that, obviously, you know, that impacts the litigation." Similarly, the only interest of appellant's identified to the trial court in briefing was to "not have [respondent] hinder or misuse the discovery process." This desire was repeated in appellant's reply brief here—his opening brief did not address the issue of standing—wherein he noted it was based on his "legally protected interest and right to conduct discovery and not have [respondent] frustrate or misuse the discovery process .…" It is obvious this is not the kind of concrete and particularized legal interest that creates a duty for an attorney to not act against appellant's interest, either due to loyalty or confidentiality. Rather, this is just a general interest in fair process, which courts have routinely held provides no standing for a disqualification motion.

Further, even if we ignored standing and reached the merits of the issue, appellant proffers no actual evidence of witness coercion or tampering that might give us pause in an appropriate case. While appellant indicates he has a general concern with the concept of a defendant paying for attorneys for its employees, appellant points to no evidence here that any witness changed their statements or testimony because they were represented by an attorney paid for by their employer. Providing separate counsel for its

36.

employees is significantly more protective of employee autonomy than having the employer's attorney simply represent its employees, which is much more commonplace and which courts have routinely sanctioned. (*Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation Corp.* (1992) 6 Cal.App.4th 1256, 1261–1264; *Bobele v. Superior Court* (1988) 199 Cal.App.3d 708, 712–715 [preventing the plaintiff's counsel from interviewing current employees without the corporation's counsel present].) Even if we were to reach the merits here, we would not find error in the trial court's denial of appellant's motion.

Appellant provides no explanation as to why it was substantially justified for him to bring a discovery motion seeking sanctions and disqualification of counsel that he had no standing to bring, nor why his motion should have been granted despite a complete paucity of evidence of witness coercion or tampering. Further, his objection to the trial court's failure to spell out the lack of substantial justification is unavailing. "It is a fundamental principle of appellate review that we presume that a judgment or order is correct." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1271.) "[I]t is the appellant's burden of providing a record that establishes error, and where the record is silent, we must indulge all intendments and presumptions to support the challenged ruling." (*Ibid.*) The trial court need not specifically indicate it found no substantial justification for the motion, as such a finding is implicit in the trial court's ruling. (See *Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 294 ["The court need not make an explicit finding the exception [for substantial justification] does not exist as this is implied in the order awarding sanctions."].) Were we reviewing this issue de novo, we would still find appellant lacks standing and there was no substantial justification for appellant bringing a disqualification motion he lacked even a plausible argument for standing to bring. Since we do not review it de novo, we conclude the trial court did not abuse its discretion in awarding sanctions.

**DISPOSITION**

The trial court's orders are affirmed.  Respondent is entitled to its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.